ATTORNEY FOR APPELLANT
Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Shari L. Vanderploeg
Indianapolis, Indiana

Robert J. Henke
Indianapolis, Indiana

# In the
# Indiana Supreme Court

FILED
Oct 11 2011, 12:15 pm

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

No. 49S04-1101-JT-46

IN THE MATTER OF THE INVOLUNTARY
TERMINATION OF PARENT-CHILD
RELATIONSHIP OF C.G., MINOR CHILD AND
HER MOTHER, Z.G.,

Z.G. (MOTHER)

*Appellant (Respondent below),*

v.

MARION COUNTY DEPARTMENT OF
CHILD SERVICES,

*Appellee (Petitioner below),*

AND

CHILD ADVOCATES, INC.,

*Co-Appellee (Guardian Ad Litem).*

Appeal from the Marion County Superior Court, 49D09-0903-JT-013906
The Honorable Marilyn A. Moores, Judge
The Honorable Larry E. Bradley, Magistrate

On Petition to Transfer from the Indiana Court of Appeals, No. 49A04-1002-JT-75

**October 11, 2011**

**David, Justice.**

We have granted transfer from the Court of Appeals on this case involving the termination of parental rights between the child, C.G., and the child's mother, Z.G. We write to discuss important issues of due process that have not previously been before this Court. In all other aspects, we summarily affirm the Court of Appeals.

**Facts and Procedural History**

C.G. (Child) was born on December 22, 2000, to Z.M. (Mother). In 2004, Mother and Child moved to Indianapolis. In January 2008, Mother requested permission from Child's school to take Child to Utah, but the school indicated Child could not miss any more school days. Thereafter, Mother left Child with a male friend, F.L., and traveled to Utah to visit family. In February 2008, F.L. brought Child to stay with C.O. (Neighbor). Neighbor knew Child and had watched Child after school the previous year. During the three months that Child was at Neighbor's house, Neighbor purchased clothes and a bed for Child and included Child in family events. However, Neighbor did not speak to Mother at all during this time period. F.L. then took Child on spring break and brought Child back in April 2008, leaving Child at another individual's house in the neighborhood. A few hours later, Neighbor discovered Child was back in the neighborhood. Shortly thereafter, Child began complaining that she "hurt in her privates." After consulting with the Healthy Families Program, Neighbor took Child to the hospital on that same day. Child was diagnosed with genital herpes and had scarring around the anus and perineum. Child's examining physician concluded Child had likely been sexually abused. Child was hospitalized for two days, during which time Neighbor stayed with Child. On April 17, 2008, upon release from the hospital, the Department of Child Services (DCS) took custody of Child and placed Child in a foster home, where Child still resides.

As is its practice, the first family case manager (FCM 1) for DCS was assigned to assess the case. FCM 1 spoke to Child and Neighbor in the hospital and transported Child to foster care. During this initial assessment, FCM 1 learned that Mother had been arrested in Utah. FCM 1 called the Salt Lake County Jail as well as the state and federal prisons in Utah. On April 18, 2008, DCS filed a Child in Need of Services (CHINS) petition alleging Mother had

"abandoned the child in the care of various individuals who are unable and or unwilling to provide the child with appropriate care."

Shortly after working on Child's case, FCM 1 left DCS. In May 2008, a second family case manager (FCM 2) was assigned to the case. After taking over the case, FCM 2 did not speak to Neighbor. FCM 2 swore in an Affidavit of Diligent Inquiry (ADI) that he had spoken to family acquaintances regarding the whereabouts of Mother, but no such contacts were made. Based upon the ADI, Mother was served by publication in the CHINS case. On August 6, 2008, the child was adjudicated a CHINS.

During the time Mother was incarcerated, she made attempts to inquire about Child. Once Mother learned of Child's involvement with DCS, she wrote DCS on October 14, 2008. The letter was written in Spanish and informed DCS she was incarcerated and asked that an investigation be brought against F.L. The letter also inquired if Child was in DCS custody and if she could have a family member pick up Child. In November 2008, DCS learned that Mother was incarcerated in Henderson, Kentucky, after receiving her letter.

On December 15, 2008, FCM 2 responded in writing, informing Mother that Child was currently in a foster home; asking Mother when her release date from jail would be; and stating that there were "legal procedures that go along with this case which can lead to termination of parental rights."

On December 23, 2008, Mother sent a second letter to DCS:

> Thank you for responding back and letting me know how my daughter is. I have been writing and trying to get in contact since the moment I found out [Child] was in the custody of the state, which was not to [sic] long ago.
>
> I have a court date in April, and am not sure yet what the outcome will be, so I would like a family member to pick my child up. I love her so much and do not want to lose her. The person which had her when I came to jail did not inform me that my daughter had been taken. Instead he was writing me letters leading me to believe she was in good care and was fine, but since I was writing a member of our church we attended I was able to find out the truth. Hopefully everything will get cleared on my end and I will be out soon but until then I would like my mother or a family member to care for my daughter.

Mother received no response to that letter, and she asked a friend to call DCS on her behalf. DCS refused to give Mother's friend any information because she was not a parent. On February 12, 2009, Mother wrote a third letter to DCS, again asking for information about Child. The letter also asked for information about the alleged sexual abuse and inquired whether Child could go live with Child's sister.

Mother never provided DCS with the name of Child's father or the family members with which she wanted Child placed. Candy Duran lived with Mother's brother, Rosalio Cruz, for eleven years, had two children with him, and lived in Salt Lake City. Duran called DCS in an attempt to gain custody of Child but DCS did not consider Duran for possible placement of Child because Mother's brother was incarcerated and Duran is not a blood relative.

DCS filed the petition to terminate Mother's parental rights on March 25, 2009, and served Mother by mail at the Henderson County Jail where she was incarcerated on federal charges. Mother filed motions to be transported to the trial or to allow her to participate by teleconference, but those motions were denied. Mother, however, was allowed to participate telephonically in the proceedings. On January 11, 2010, the juvenile court entered an order terminating the parent-child relationship between Mother and Child. Child has since been adopted by foster parents.[1]

## Due Process Analysis

Mother contends that numerous due process violations occurred which culminated in the termination of her parental rights. Mother also alleges that there was a lack of evidence to support the trial court's determination. We will address each issue separately.

It is well established that the involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed. In re B.D.J., 728 N.E.2d 195, 199 (Ind. Ct. App. 2000). Choices about marriage, family life, and the upbringing of children are among associational rights the United States Supreme Court has

---

[1] At this time, we do not address the effects of reversing a termination order when a child has already been adopted. It might be advisable for prospective adoptive parents and the courts to wait until the expiration of any appeal before going forward with an adoption. Alternatively, if a court proceeds with an adoption while TPR proceedings are still on appeal, the court should advise all parties, especially the prospective adoptive parents, of the possibility of reversal.

4

ranked as of basic importance in our society and are rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. M.L.B. v. S.L.J., 519 U.S. 102, 116 (1996). "If any freedom not specifically mentioned in the Bill of Rights enjoys a 'preferred position' in the law it is most certainly the family." Moore v. City of East Cleveland, 431 U.S. 494, 511 (1977) (Brennan, J., concurring).

"The Due Process Clause of the U.S. Constitution and the Due Course of Law Clause of the Indiana Constitution prohibit state action that deprives a person of life, liberty, or property without a fair proceeding." In re Paternity of M.G.S., 756 N.E.2d 990, 1004 (Ind. Ct. App. 2001), trans. denied. Parental rights constitute an important interest warranting deference and protection, and a termination of that interest is a "unique kind of deprivation." Lassiter v. Dept. of Soc. Servs., 452 U.S. 18, 27 (1981). However, children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long–term, continuous relationships. Lehman v. Lycoming County Children's Servs. Agency, 458 U.S. 502, 513 (1982). When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. J.T. v. Marion County Office of Family & Children, 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000), trans. denied. The U.S. Supreme Court has written on the importance of heightened due process protections whenever the State wishes to sever the parental bonds of children:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

Santosky v. Kramer, 455 U.S. 745, 753–754 (1982). Due Process has never been defined, but the phrase embodies a requirement of "fundamental fairness." E.P. v. Marion County O.F.C., 653 N.E.2d 1026, 1031 (Ind. Ct. App. 1995) (quoting Lassiter, 452 U.S. at 26). The U.S. Supreme Court has written that "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S.

5

319, 333 (1976).  The process due in a termination of parental rights proceeding turns on the balancing of three factors:  (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure.  A.P. v. Porter County Office of Family & Children, 734 N.E.2d 1107, 1112 (Ind. Ct. App. 2000,) trans. denied (citing Mathews, 424 U.S. at 335).  The balancing of these factors recognizes that although due process is not dependent on the underlying facts of the particular case, it is nevertheless "flexible and calls for such procedural protections as the particular situation demands."  Mathews, 424 U.S. at 334.  Finally, we must keep in mind the general principle that "if the State imparts a due process right, then it must give that right."  A.P. v. Porter County, 734 N.E.2d at 1112.  A parent in a proceeding to terminate the parent–child relationship is statutorily entitled to (1) cross-examine witnesses, (2) obtain witnesses or tangible evidence by compulsory process, and (3) introduce evidence on behalf of the parent.  Ind. Code § 31-32-2-3(b) (2008).

In balancing the three–prong Mathews test, we first note that the private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of her child.  In re C.C., 788 N.E.2d 847, 852 (Ind. Ct. App. 2003).  We also note the countervailing Mathews factor, that the State's *parens patriae* interest in protecting the welfare of a child is also substantial.  Id.  Both the State and the parent have substantial interests affected by the proceeding.  So, we turn to the third Mathews factor, the risk of error created by DCS's actions and the trial court's actions.  We address each of Mother's allegations in order.

*A.  Service on Mother*

Mother first contends numerous due process violations including a lack of service from DCS and lack of effort by DCS in locating Mother, culminating with Mother not attending the termination hearing.  It is of paramount importance in any DCS case for parents of children involved with DCS to receive notice of such involvement.  When matters are at the termination stage of a case, and a child is already adopted, it is in nobody's interest that the case be remanded and the adoption potentially be undone due to improper service.

The record reflects FCM 1 discovered Mother had been arrested in Utah and contacted two county jails in Utah in search for Mother.  The record further reflects that FCM 1 looked for

6

Mother through the Marion County Jail and Indiana Department of Corrections. Further, FCM 1 searched various DCS databases and looked in the local telephone directory. FCM 1 was unable to locate Mother in her efforts. FCM 2 then took over the case and initiated his own investigation into Mother's whereabouts. He made the same search attempts as FCM 1 and was also unable to locate Mother. During these search attempts, Mother was incarcerated on federal charges in Henderson, Kentucky. Although the technology and ability to locate people has advanced, there is no centralized technology whereby DCS can type in a person's name and learn her whereabouts if incarcerated. DCS had no reason to suspect Mother would be in federal custody and no reason to suspect Mother would be in Kentucky. DCS cannot be expected to find a needle in a haystack, which is what Mother is asking DCS to have done. We agree with the Court of Appeals and conclude that if any error existed in DCS locating Mother at this stage of the case, it did not substantially increase the risk of error in her termination proceeding.

Mother next contends that DCS misrepresentations on the ADI, which led to Mother being served by publication, substantially increased the risk of error leading to her termination. Specifically, FCM 2 stated in the ADI, which led to the service by publication, that he asked "family acquaintances regarding the parent's whereabouts." However, FCM 2 did not speak to any family acquaintances. FCM 2 did, however, check with the Marion County Jail, Indiana Department of Corrections, ICES and ICWIS internal databases, telephone directory, Utah State Prison, Utah Federal Prison, and Salt Lake County Jail. The Affidavit of Diligent Inquiry was signed and affirmed "under the penalties for perjury, that the foregoing representations are true and accurate to the best of my knowledge and belief." We find it extremely troubling that a representative from DCS would make a misrepresentation on such an important document. FCM 2 offered the excuse that the Affidavit "populated" automatically and could not be deleted. If this is accurate, DCS should correct its internal system to ensure that these "populations" cease immediately so that only accurate information exists on its forms. Yet, in the present scenario, we observe that there were no known family acquaintances for FCM 2 to contact about mother's whereabouts. The error would be significantly more egregious if there were family acquaintances with whom FCM 2 knew to inquire about mother's whereabouts. We also note that Mother was able to cross-examine FCM 2 on this issue during the termination proceeding, which allowed the court to assess FCM 2's credibility in determining what impact this had on Mother's due process rights as well as on FCM 2's credibility as a witness. We hold that the

7

misrepresentation on the affidavit, in this limited instance, did not violate Mother's due process rights.

*B.  DCS Contact with Mother*

We now turn to Mother's due process argument that DCS failed to inform Mother of the CHINS proceedings after she initiated contact with DCS.  We note the timeline of Mother's contact with DCS and the DCS response.  Once Mother learned of C.G.'s involvement with DCS, she wrote DCS on October 14, 2008.  The letter was written in Spanish and informed DCS she was incarcerated, inquired if Child was in DCS custody and if a family member could pick up Child.  Once FCM 2 received the letter, sometime in November 2008, he learned that Mother was incarcerated in Henderson, Kentucky.  FCM 2 responded on December 15 but did not explicitly state that Child was currently a CHINS.  Rather, FCM 2 inquired into Mother's release date and asked what her plans were to parent.  FCM 2 did explain that "there are legal procedures that go along with this case which can lead to termination of parental rights." Furthermore, he informed Mother that Child was in a pre-adoptive home.  Mother immediately responded to FCM 2 with a letter on December 23.  Mother wrote that she had a court date in April 2009 which she hoped would work everything out, and in the meantime requested a family member come take Child.  After not hearing from DCS, Mother sent another letter on February 12, 2009.  This letter again inquired into how Child was doing, requested family come and take Child, and also included a card for Child.  It was not until after receiving this February letter that DCS sent Mother an advisement of rights form and a copy of the CHINS petition.  Mother then requested counsel in the CHINS.  Within the month, DCS filed its termination petition, and Mother did not receive her counsel in the CHINS action until after DCS filed its termination petition.

The delay in advising mother of her rights and informing her of the CHINS action is disturbing and inappropriate.  There was no reason for this delay.  Upon obtaining Mother's letter dated October 14, 2008, DCS should have contacted Mother immediately.  The initial response should have included the advisement of rights form and the CHINS petition form.  Doing so would have allowed Mother representation in the CHINS proceedings at an earlier stage.  However, in this case, we cannot conclude that the dilatory action resulted in fundamental

8

error or deprived Mother of due process. Mother was incarcerated at that time and awaiting a possible ten-year sentence. Although it may have been advisable for DCS to have put the brakes on the termination petition upon locating Mother, or at least temporarily slowed down the proceedings, she was nevertheless in federal custody for transporting drugs. Furthermore, the termination proceeding did not conclude until January 2009. We find the error would have been much more egregious if the court had conducted an expedited termination hearing, sometime shortly after the termination petition being filed. However, the delays in the termination proceeding and the continuances granted provided further opportunity for Mother and her counsel to attempt to prove Mother's fitness to parent and also to prepare for trial. Finally, we note that Mother was fully and diligently represented in the termination proceeding. Counsel was able to question FCM 2 about the lack of communication with Mother, and Mother was able to present her argument to the trial court judge about any due process violations from the lack of contact. The delay from DCS in advising Mother of her rights and serving her with the CHINS petition upon locating Mother is a very poor practice model in the field of child protection. But a reversal is not warranted in this case.

## C. Personal Attendance at Termination Hearing

Finally, Mother argues that her due process rights were violated by denying her the opportunity to be present at trial due to the standing order existing in Marion County, which prohibited the transportation of incarcerated parents to the Marion County Juvenile court proceedings. On October 1, 2006, the Marion Superior Court issued an "Order Prohibiting Transportation of Incarcerated Adults to the Marion County Juvenile Center." In that order, the executive committee of the Marion Superior Court determined it would no longer transport incarcerated adults to participate in juvenile court proceedings. The order stated,

> WHEREAS, incarcerated adults have routinely been transported to the Marion County Juvenile Center for participation in juvenile court proceedings; and
>
> WHEREAS, the Executive Committee of the Marion Superior Court has determined that this practice should be discontinued.
>
> IT IS THEREFORE ORDERED, that incarcerated adults be prohibited from transport to the Marion County Juvenile Center, effective immediately. This Order does not apply to transportation of incarcerated adults to court facilities other than the Marion County Juvenile Center.

IT IS FURTHER ORDERED, that the Marion County Sheriff's Department seek clarification for any pending transportation order from the court issuing that order, if it would require the transportation of an incarcerated adult to the Marion County Juvenile Center.

The record reflects that some adults had been transported to the Marion County Juvenile Center until March 2009, when it became a safety concern due to the "no sight, no hearing" policy of holding adults and juveniles in the same facility.[2]

The Court of Appeals first addressed this issue in Tillotson v. Clay County Dep't of Family and Children, 777 N.E.2d 741 (Ind. Ct. App. 2002). The Court of Appeals found that parents were not denied due process when they were not transported to their termination hearing. Id. at 746. The Court of Appeals, however, cautioned that alternative procedures should be used to allow a parent who could not be present in the courtroom to fully participate. It wrote such alternative procedures could include, "using a speaker phone at the hearing or continuing the hearing after the State has presented its case and allowing the parent time to review a transcript or audio tape of the hearing and then respond to allegations raised by the State's witnesses." Id. at 746 n.7. We note that Mother participated in both days of the termination hearing telephonically, with interpreters in the courtroom translating the proceeding into Spanish. However, there are risks when a party in such a delicate proceeding is not transported to the hearing.

We first recognize that trial judges are in the best place to assess witness credibility, and by not having a parent present at a termination hearing, a trial judge is not as easily able to ascertain the credibility of a witness over the phone. Credibility of a witness must be ascertained from "circumstantial evidence, including the demeanor of the witness, the plausibility of the testimony, and the relative strengths of the evidence supporting and opposing the testimony." Simpson v. State, 165 Ind. App. 619, 622, 333 N.E.2d 303, 304 (1975). "From consideration of this evidence, the trier of fact can form an opinion of the 'probability' that a particular witness is relating an accurate account of the incident." Id. Our trial rules shed light on the deference we give the trial court judge when she is the trier of fact:

---

[2] This is from testimony of the Chief Baliff of the Marion Superior Court Juvenile Division. It appears in conflict with the order dated October 2006. Nevertheless, at one time, adults were transported to the Marion County Juvenile Center.

> On appeal of claims tried by the court without a jury or with an advisory jury, at law or in equity, the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and *due regard shall be given* to the opportunity of the trial court to judge the credibility of the witness.

Ind. Trial Rule 52(A) (emphasis added). We recognize the unique position of the trial court to assess the evidence and judge the credibility of the witnesses, and only set aside a judgment terminating a parent-child relationship if it is clearly erroneous. Egly v. Blackford County Dept. of Pub. Works, 592 N.E.2d 1232, 1234–1235 (Ind. 1992).

In the present case there were several procedural safeguards undertaken by the trial court. The courtroom was cleared out to provide Mother an opportunity to privately speak to her counsel. The trial was bifurcated, giving Mother an opportunity to review the testimony presented by DCS with her counsel. Counsel had ample opportunity to confer with Mother, having been on the case for over six months. Finally, we note the potential significant cost of transporting Mother from Henderson, Kentucky, to Indianapolis, Indiana, for this hearing. It is possible that our analysis may have been different had Mother been across town in the Marion County Jail.

After examining a number of other jurisdictions, we observe that the commonly held viewpoint is that there is no absolute right to be present at a termination hearing.

Of the states we have surveyed that have found no absolute right of a parent to be present at a termination hearing, they take different paths to arrive at their conclusions. The first jurisdiction to address this issue was North Dakota. Many courts have taken the lead from North Dakota, which found that

> a convict does not have a constitutional right to personally appear in a civil suit where he has been permitted to appear through counsel and by deposition, if appropriate. Any right to appear personally would have to rest upon convincing reasons and would ultimately be left to the sound discretion of the trial court.

In re F.H., 283 N.W.2d 202, 209 (N.D. 1979). Many courts have followed the North Dakota model, and provided discretion to the trial court judge, while finding that representation by counsel and the opportunity to appear via deposition are the two key components required in a due process analysis of a parent who is not in attendance at a proceeding in which her parental

11

rights are terminated.  Pignolet v. State Dept. of Pensions and Security, 489 So.2d 588, 590–591 (Ala. Civ. App. 1986); In re Appeal in Pima County Juvenile Action No. S-949, 638 P.2d 1346, 1347 (Ariz. Ct. App. 1981); In re C.G., 885 P.2d 355, 357 (Colo. App. 1994); In re Juvenile Appeal, 446 A.2d 808, 813 (Conn. 1982); In re F.L.S., 502 S.E.2d 256, 257 (Ga. Ct. App. 1998); In re Baby Doe, 936 P.2d 690, 694–695 (Idaho Ct. App. 1997); In re M.R., C.R., D.R., M.R. and M.R., 736 N.E.2d 167, 169–170 (Ill. App. Ct. 2000); In re J.S., 470 N.W.2d 48, 52, (Iowa Ct. App. 1991); In Interest of S.A.D., 481 So.2d 191, 193–194 (La. Ct. App. 1985); In re Adoption/Guardianship No. 6Z980001, 748 A.2d 1020, 1022–1024 (Md. Ct. Spec. App. 2000); In re Welfare of H.G.B., 306 N.W.2d 821, 826 (Minn. 1981); H.W.S. v. C.T., 827 S.W.2d 237, 242 (Mo. Ct. App. 1992); In re Raymond Dean L., 109 A.D.2d 87, 90 (N.Y.  App. Div. 1985)[3]; In re John Henry Rich, IV, 604 P.2d 1248, 1252–1253 (Okla. 1979); In re A.P., 692 A.2d 240, 243–244 (Pa. Super. Ct. 1997); Najar v. Oman, 624 S.W.2d 385, 387 (Tex. App. 1981); State ex rel. M.A.V. v. Vargas, 736 P.2d 1031, 1033–1034 (Utah Ct. App. 1987); Darrow v. State, 649 P.2d 858, 861 (Wash. Ct. App. 1982).

Other courts have found that parents are afforded an even higher due process right than merely being represented and the opportunity for testimony via deposition.  Nebraska followed the North Dakota model and established criteria to aid its trial courts in determining whether to allow a parent's attendance at a termination of parental rights hearing.  Nebraska wrote that courts should consider trial delay, expense on the State in transporting the parents, potential danger or security risk which may occur, the reasonable availability of the parent's testimony by other means, and the best interest of the child.  In re L.V., 482 N.W.2d 250, 258 (Neb. 1992). Other courts have followed Nebraska's lead and found extra protections, such as the right to review transcripts, right to appear via telephone, and even bifurcating of the trial to allow counsel and parent additional time.  E.J.S. v. State, Dept. of Health and Social Servs., 754 N.W.2d 749, 752 (Alaska 1988); In re Heller, 669 A.2d 25, 32 (Del. 1995); In re Randy Scott B., 511 A.2d 450, 453–454 (Me. 1986); Adoption of Edmund, 739 N.E.2d 274, 277 (Mass. App. Ct. 2000); In re Vasquez, 501 N.W.2d 231, 234–235 (Mich. Ct. App. 1993); In re Baby K., 722 A.2d 470, 472–474  (N.H. 1998); State, ex rel. Children, Youth and Families Dept. v. Ruth Anne E.,

---

[3] We note that in this matter, the father was unable to attend the termination hearing due to a physical disability. However, the New York Supreme Court Appellate Division analogized this case with several of the incarcerated parents cases that are cited herein.

974 P.2d 164, 168–171 (N.M. Ct. App. 1999); State ex rel. Juvenile Dept. v. Stevens, 786 P.2d 1296, 1299 (Or. Ct. App. 1990); State ex rel. Jaenette H. v. Pancake, 529 S.E.2d 865, (W. Va. 2000); In re Christopher D., 530 N.W.2d 34, 42 (Wis. Ct. App. 1995). We also note that a recent Kansas opinion overturned an adoption which resulted in the termination of a father's right because he was not transported even though he was incarcerated in-state. In re Adoption of B.J.M. 209 P.3d 200 (Kan. Ct. App. 2009).

We believe West Virginia has outlined a very practical test, which we now adopt. Whether or not an incarcerated parent is permitted to attend a termination of parental rights hearing is within the sound discretion of the trial court judge. In exercising that discretion,

> the trial court judge should balance the following factors: (1) The delay resulting from parental attendance; (2) the need for an early determination of the matter; (3) the elapsed time during which the proceeding has been pending; (4) the best interests of the child(ren) in reference to the parent's physical attendance at the termination hearing; (5) the reasonable availability of the parent's testimony through a means other than his or her attendance at the hearing[4]; (6) the interests of the incarcerated parent in presenting his or her testimony in person rather than by alternate means; (7) the affect of the parent's presence and personal participation in the proceedings upon the probability of his or her ultimate success on the merits; (8) the cost and inconvenience of transporting a parent from his or her place of incarceration to the courtroom; (9) any potential danger or security risk which may accompany the incarcerated parent's transportation to or presence at the proceedings; (10) the inconvenience or detriment to parties or witnesses; and (11) any other relevant factors.

State of West Virginia ex rel. Jaenette H., 529 S.E.2d at 877 (W.Va. 2000).

A blanket order prohibiting transporting a prisoner to a termination hearing is frought with danger. If the trial courts were allowed to hide behind such a blanket order, on review our appellate courts would be left with little to no information, forcing them to surmise why the trial court issued the order. This is not good policy. However, in the case at bar, the trial court would have arrived at the conclusion to not transport the mother, as we have previously discussed.

---

[4] We note in the record that the Marion County Juvenile Center has video equipment allowing for videoconferencing of incarcerated parents if the parents are in a facility that also has videoconferencing equipment. Although the IT Manager for the Juvenile Center testified the Indiana Supreme Court did not approve of the Center using this equipment, ("I know that video court is not an approved method"), the use of videoconferencing equipment can be used in termination proceedings, subject to the provisions of Indiana Administrative Rule 14.

*D. Sufficiency of the Evidence*

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. Bester v. Lake County Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). We consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. We apply a two-tiered standard of review when reviewing findings of fact and conclusions of law in a termination case. We first determine whether the evidence supports the findings, and second we determine if the findings support the judgment. Page v. Greene County Dep't of Welfare, 564 N.E.2d 956, 959 (Ind. Ct. App. 1991). We set aside the trial court's judgment only if it is clearly erroneous. In re B.C., 441 N.E.2d 208, 211 (Ind. 1982). A judgment is "clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." In re R.J., 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005). If the evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999).

The Fourteenth Amendment of the United States Constitution protects the traditional right of parents to establish a home and raise their children. In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. A parent's interest in the care, custody, and control of their children is "perhaps the oldest of the fundamental liberty interests." Troxel v. Granville, 530 U.S. 57, 65 (2000). The parent-child relationship is "one of the most valued relationships in our culture." Tillotson v. Clay County Dep't of Family & Children, 777 N.E.2d 741, 745 (Ind. Ct. App. 1002), trans. denied. However, parental rights are not absolute, and may be terminated "when the parents are unable or unwilling to meet their parental responsibilities." In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied.

In seeking an involuntary termination of parental rights, the State must prove in relevant part the following:

> (B) There is a reasonable probability that:
>
> > i. The conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

ii. The continuation of the parent-child relationship poses a threat to the well-being of the child;

(C) Termination is in the best interests of the child; and

(D) There is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b) (2008). The State must prove the allegations by "clear and convincing evidence." Ind. Code § 31-37-14-2 (2008).

Mother challenges the evidence that supports several of the trial court's findings of fact. Mother first argues that the evidence does not support the finding that "[a] diligent inquiry to find and serve Mother was made to no avail, and service of the CHINS action was made upon her by publication." We disagree. As previously discussed, upon learning Mother had been arrested in Utah, FCM 1 contacted jails in Utah and did not find her. By this time, Mother had been transported to Henderson, Kentucky. FCM 1 had no way of knowing Mother would be located there. FCM 1 further checked with the Marion County Jail, Indiana Department of Corrections, two DCS databases, and the local phone directory. When FCM 2 took over the case, he made similar searches as FCM 1 did. At this time, FCM 2 still had no reason to know Mother was located in Henderson, Kentucky. This evidence is sufficient to support the trial court's finding.

Mother challenges the evidence does not support the finding that "Mother sent two more letters to [DCS] with names of possible placement for [Child]. By this time, [Child] was in an appropriate foster home and relatives who were contacted were not interested in going through the process for placement." We agree with the Court of Appeals analysis. The finding is misleading because Child's aunt contacted FCM 2. FCM 2 did not initiate the contact. However, we find that misstatement harmless because the crux of the finding is that the aunt was not interested in going through the process for placement. FCM 2 informed the aunt that she would need to come to Indianapolis and undergo a background check, and she was unwilling to do so. We find the trial court's error to be harmless, and find sufficient evidence to support the finding.

Mother challenges the evidence does not support the finding that "Mother thinks she will be sentenced to ten (10) years of incarceration." Again, we agree with the Court of Appeals

analysis. Mother acknowledged twice that she was told she had a ten–year sentence. Mother first stated, "[t]hey told me it was ten years for conspiracy." Later, she again said, "I was told that I could be there for ten years for conspiracy." To the best of Mother's knowledge, she would be serving ten years. We find sufficient evidence to support the finding.

Mother challenges the trial court's findings regarding Child's therapy. Those findings are

12. [Child] is currently in therapy, working on four issues: 1) processing her sexual abuse, 2) abandonment by her mother, 3) insecurity and 4) adjustment in her current placement.

13. [Child] has made much progress on issues with the exception of the sexual abuse, an issue that she is not ready to address but needs to be in the future.

14. [Child] has been placed with foster parents since April 2008, and the foster parents are willing to adopt her. [Child's] needs are being met, including most importantly, her need for continued therapy.

Mother claims Child's therapeutic needs are not being met based on the therapist's qualifications. We disagree. The therapist testified to having limited experience working with child sex abuse victims but felt she could address Child's current therapeutic needs. The therapist also stated if Child needed therapy beyond her ability, she would refer Child to someone else. Therapist testified she planned on continuing to work with Child. We find the evidence supports the trial court's findings that Child's therapeutic needs are being met.

Finally, Mother challenges finding 18, which states:

Termination of the parent-child relationship is in [Child's] best interests. Reunification is not possible. Termination, providing the opportunity for a subsequent adoption, would accomplish the goal for [Child] to be granted a permanent home in a loving and stable environment, where she has integrated and bonded, and will have her physical and therapeutic needs met. It would be harmful to [Child] if she were removed from her current placement, and could set her back in her therapy. It is not disputed that Mother loves her daughter. However, Mother is unavailable to parent and [Child's] interests in moving forward toward permanency are tantamount to Mother's parental rights being left in tact [sic].

The record reflects FCM 2 stated that giving Mother more time to work toward reunification would not give Child a sense of permanency and would not be in her best interest.

16

FCM 2 further stated Child has bonded with her foster family, and it would be in her best interest for the termination to be granted.

Child's Guardian ad litem (GAL) testified that Child needed permanency and granting termination would provide permanency for child. GAL further testified that Child was very bonded with her foster mother. We find the evidence in this case supported the trial court's findings that termination of the parent-child relationship is in Child's best interests.

## Conclusion

In this case, several errors were made by DCS which should not have been made. However, none of the errors rose to the level of violating Mother's due process rights or warranting reversal. Therefore, we affirm the order of the trial court terminating Mother's parental rights. We also set forth the above mentioned factors for our trial courts to determine whether an incarcerated parent is permitted to attend a hearing on the termination of his or her parental rights.

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.