


FILED

May 07 2025, 9:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

I N T H E

# Court of Appeals of Indiana

In the Matter of B.R., Minor Child Alleged to be a Child in
Need of Services;

B.R. (Father),

*Appellant-Respondent*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

and

D.B. (Guardian),

*Appellee-Guardian*

---

May 7, 2025

Court of Appeals Case No.
24A-JC-2594

Appeal from the Hamilton Superior Court

The Honorable Michael A. Casati, Judge

The Honorable Valorie S. Hahn, Magistrate

Trial Court Cause Nos.
29D01-2403-JC-323
29D01-2404-GU-56

---

**Opinion by Judge Tavitas**
Chief Judge Altice and Judge Brown concur.

**Tavitas, Judge.**

## Case Summary

[1] In this consolidated appeal, B.R., Sr. ("Father") appeals the trial court's grant of a guardianship of B.R., Jr. ("Son") to D.B. ("Aunt") and the trial court's dismissal of child in need of services ("CHINS") proceedings after the CHINS permanency plan was changed to guardianship. Father argues that the procedures used by the trial court here violated his due process rights. Although we agree with Father that the proper statutory procedures were not followed here, under these circumstances, we cannot conclude that Father's due process rights were violated. Accordingly, although we do not condone the failure to follow the proper statutory procedures, we affirm.

## Issue

[2] Father raises one issue, which we restate as whether Father's due process rights were violated by the procedures used to grant the guardianship petition and dismiss the CHINS action.

## Facts

Son was born to Father and K.M. ("Mother") in October 2008. In early 2023, Mother and her three children—Son, J.T, and B.R. ("Adult Daughter")—moved from Illinois to Indiana; Father was incarcerated at that time. Son has ADHD and some behavioral issues. Aunt is Mother's sibling and resides in Illinois.

Father was released from incarceration and moved to Mother's residence in Indiana in August 2023. At that time, Mother was battling cancer, and Mother unfortunately died in February 2024. Aunt obtained guardianship of Mother's youngest child, J.T., but Son remained with Father.

On March 2, 2024, the Department of Child Services ("DCS") received a report that Father physically assaulted Son by tearing a chunk of hair out of Son's head and hitting Son on the head with a candlestick. Son was bleeding and treated by paramedics. Father, who was heavily intoxicated, was arrested and taken to jail. The State charged Father with three counts of intimidation, Level 6 felonies; and two counts of domestic battery, Level 6 felonies. A no contact order was entered that prevented Father from contacting Son. Father became homeless and started living at a shelter, Wheeler Mission.

On March 4, 2024, DCS filed a petition alleging that Son was a CHINS. Son was placed in the care of Adult Daughter. Adult Daughter, however, was moving back to Illinois at the end of May 2024 to attend college. Moreover, the lease on Mother's residence was expiring at the end of May 2024.

On April 3, 2024, Aunt filed a petition for guardianship of Son. The petition erroneously alleged that a CHINS petition "ha[d] not been filed regarding this child" and that "Mother and Father are deceased." Appellant's App. Vol. II pp. 30-31.

In the CHINS action, on April 29, 2024, Father admitted that Son was a CHINS due to Father's pending criminal allegations and the no contact order. The CHINS court set the matter for a dispositional hearing on May 31, 2024.

Father became aware of the guardianship petition and, on May 10, 2024, wrote a letter to both the CHINS court and the guardianship court to report that Aunt had filed a guardianship action and that a CHINS action was pending. Father objected to the guardianship and stated that he had been working with DCS to regain custody of Son.

On May 16, 2024, the guardianship court, on its own motion, transferred the matter to the juvenile court with jurisdiction of the CHINS matter. The juvenile court then set the matter for a hearing on the petition for guardianship.

The CHINS court held a dispositional hearing on May 31, 2024, and issued its order on June 3, 2024. At that point, the permanency plan was reunification. At the dispositional hearing, the family case manager ("FCM") testified that Son was currently placed with Adult Daughter, who was moving to Illinois to go back to college; a guardianship action had been filed by Aunt; Son's social security card was required to start the Interstate Compact on the Placement of Children ("ICPC") process, but Father was refusing to give the social security

card to DCS; Aunt "can't have placement at this point" because the ICPC process had not been started; and the ICPC would not be necessary if the CHINS court granted the guardianship petition. CHINS Tr. Vol. II p. 10. Father's counsel argued that a third party could not "move for custody" until a guardianship permanency plan was approved in the CHINS action or the CHINS action was dismissed. *Id.* at 17.

[12] On June 10, 2024, Father filed an objection in the CHINS matter and argued that "the pending guardianship must b[e] stayed pending the outcome of the existing CHINS proceeding." Appellant's App. Vol. III p. 7. The guardianship court, however, held a hearing on the guardianship matter on June 11, 2024. Father appeared at the hearing and represented himself. Son, age fifteen at the time, consented to the guardianship.

[13] Adult Daughter testified that Aunt has guardianship of Mother's youngest child, J.T., and he is doing well in Aunt's care. She testified that, when the family lived in Illinois, they rarely talked to Father, and Aunt was the person the children depended upon when Mother was unavailable. Father was incarcerated at the time they moved to Indiana, and Mother "had just got back on talking terms with him." Guardianship Tr. Vol. II p. 9.[1] According to Adult Daughter, Son was not "safe" with Father, and Father was physically and

---

[1] Although these matters were consolidated for purposes of the appeal, the transcript of the guardianship hearing, which was prepared for this appeal, was not transmitted to us. The parties, however, cited to the transcript of the guardianship hearing in their briefs, and we located the transcript in Odyssey. Accordingly, we take judicial notice of the transcript pursuant to Indiana Evidence Rule 201.

verbally abusive. *Id.* at 15. On one occasion, Son called Adult Daughter because the children were hiding in the closet and Father was "acting like [he was] going to kill them." *Id.* Adult Daughter testified that Aunt's guardianship of Son is the "best decision." *Id.* at 10.

[14] The guardian ad litem ("GAL") testified and opined that granting the guardianship is in Son's best interest due to Father's verbal and physical abuse of Son and others, especially when Father is intoxicated. Although DCS was not a party to the matter, the guardianship court asked DCS's counsel if he had any closing arguments, and the following conversation occurred:

> [DCS's Counsel]: [ ] The Department does not have an official position in this case. The Department does have an open DCS case and in that case the permanency plan is for [re]unification. However, if the guardianship were to be granted in this case the Department would move to dismiss its CHINS petition, or move to dismiss that case and seek wardship termination. I believe under the statute the Department would have to add, if the guardianship were granted the Department would have to add the guardian into the CHINS case and make them a Respondent in the CHINS case. Then we'd have to amend its petition in order to do so. But during the process of that it would ultimately be a reunification with the guardian, so practically it would be the same as the Department dismissing its case if the guardianship were to be granted here today.
>
> THE COURT: What's the Department's position with, if you're familiar with the case of *In Re N.B.*[2] with the Court proceeding

---

[2] We presume the parties were referring to *In re M.B.*, 51 N.E.3d 230, 236 (Ind. 2016).

> with the guardianship while we do not have a permanency plan of guardianship in the CHINS case?
>
> [DCS's Counsel]: I'm familiar with the case, Your Honor. And I may be inaccurately quoting it, but I do believe it says that the Court should abstain from exercising jurisdiction. I don't believe it's a mandatory must abstain from exercising jurisdiction. If that is the case, then I believe that that could be a distinction that the Court can make in this case to not follow that precedent.
>
> THE COURT: It says should be stayed. . . .

*Id.* at 22-23.

Father objected to "the guardianship case taking precedence over the CHINS case." *Id.* at 24. Father, however, did state that he was living at Wheeler Mission; he did not have housing for Son; and a no contact order was still in place.

On June 21, 2024, Son filed a response to Father's objection and requested that the guardianship court grant the guardianship. On the same day, the guardianship court entered an order granting Aunt's petition for guardianship of Son. The guardianship court found:

> 3. It is in the best interest of [Son] that a guardian be appointed.
>
> 4. There is a no contact order in place between Father . . . and [Son] . . . protecting the minor.
>
> 5. Father . . . has not had contact with [Son] in approximately three months.

6. Father is currently living at the Wheeler Mission and is unable to care for [Son].

7. Department of Child Services consents to the guardianship and advises they will dismiss their cause upon an order appointing a guardian.

8. The Guardian Ad Litem is in agreement with the guardianship and states that it is in the best interest of [Son] that [Aunt] be appointed as guardian.

Appellant's App. Vol. III pp. 10-11. Father then filed a motion to correct error in the guardianship proceedings.

[17] In the CHINS action, DCS requested a permanency hearing, and Son and the GAL requested that the CHINS action be dismissed. The CHINS court denied the motions to dismiss and set the matter for a permanency hearing. At the permanency hearing, DCS requested that the CHINS court change the permanency plan to guardianship. The FCM testified that she had not been to Aunt's home and did not do an ICPC because "it would cause a lot of roadblocks that we did not want to create so we did not file an ICPC in the guardianship proceeding." CHINS Tr. Vol. II p. 35. The FCM testified that this was not a "common" CHINS action. *Id.* at 34. Father and Son could not visit due to the no contact order, which was still in place, and even if the no contact order was vacated, Father was still living at Wheeler Mission, and Son could not live there. DCS did not do a background check on Aunt because an ICPC was not done.

On August 22, 2024, the CHINS court entered an order after the permanency hearing and found:

> 8.  Of the permanency planning options available, the Court finds it is most appropriate and consistent with the best interest of the child:
>
> > A. For [Son] to have a legal guardian appointed. Guardianship is in the child's best interests for the following reasons:  The child's father has not complied with the child's case plan.  Father does not have the ability to care for the youth as he is currently residing in a homeless shelter and there is a no contact order in place to protect the child.  The Court did not take into consideration the pending guardianship cause.  The youth wishes to remain in placement with his Aunt who has Guardianship of his brother.

Appellant's App. Vol. III p. 17.  The CHINS court then ordered that "[t]he permanency plan for [Son] of appointment of a guardian is hereby approved by the Court."  *Id.*

On August 28, 2024, the guardianship court held a hearing on Father's motion to correct error.  The guardianship court later entered an order denying Father's motion and noted that the current plan in the CHINS action was guardianship.

At the CHINS review hearing on August 30, 2024, DCS submitted an Illinois criminal background check regarding Aunt and reported that Son was doing well with Aunt.  On September 24, 2024, DCS requested that its wardship over Son be terminated, which the CHINS court granted.  Father appeals the orders

in both the guardianship matter and the CHINS matter, which were consolidated by this Court.

## Discussion and Decision

[21] Father argues that his due process rights were violated when the trial court granted the guardianship order and the CHINS dismissal. Father claims his due process rights were violated by: (1) the failure to provide Father with proper notice of the guardianship action; (2) the failure to comply with background checks required by the guardianship and CHINS statutes; (3) the guardianship being established without a permanency plan of guardianship in the CHINS action; and (4) the failure to comply with the ICPC process. Although we agree that the proper statutory procedures were not followed here, as discussed below, we cannot say that Father's due process rights were violated.

### I. Due Process Standard of Review

[22] "'The Due Process Clause of the U.S. Constitution and the Due Course of Law Clause of the Indiana Constitution prohibit state action that deprives a person of life, liberty, or property without a fair proceeding.'" *In re C.G.*, 954 N.E.2d 910, 916 (Ind. 2011) (quoting *In re Paternity of M.G.S.,* 756 N.E.2d 990, 1004 (Ind. Ct. App. 2001), *trans. denied).* "Parental rights constitute an important interest warranting deference and protection[.]" *Id.* at 916-17.

[23] Our Supreme Court has held that "[d]ue process at all stages of a CHINS case is so vital because 'procedural irregularities, like an absence of clear findings of fact, in a CHINS proceeding may be of such import that they deprive a parent

of procedural due process with respect to a potential subsequent termination of parental rights.'" *In re K.D.*, 962 N.E.2d 1249, 1258 (Ind. 2012) (quoting *In re J.Q.*, 836 N.E.2d 961, 967 (Ind. Ct. App. 2005)). Similarly, due process in guardianship proceedings is vital because such proceedings also impact parental rights. *See In re I.E.*, 238 N.E.3d 669, 679 (Ind. Ct. App. 2024) (reversing a guardianship order where the parent did not receive due process).

[24] The United States Supreme Court has held that "the fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations omitted). Due process turns on the balancing of three factors discussed in *Mathews*: "(1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *C.G.*, 954 N.E.2d at 917. "In balancing the three-prong *Mathews* test, we first note that the private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of [his] child." *C.G.*, 954 N.E.2d at 917. The countervailing *Mathews* factor—the State's *parens patriae* interest in protecting the welfare of a child—is "also substantial." *Id.* Accordingly, we focus on "the third *Mathews* factor, the risk of error created by DCS's actions and the trial court's actions." *Id.* at 917-18. In doing so, we note that "a party on appeal may waive a constitutional claim, including a claimed violation of due process rights, by raising it for the first time on appeal." *In re N.G.*, 51 N.E.3d 1167, 1173 (Ind. 2016).

## II. Relevant Statutory Procedures

[25] This case requires that we examine and harmonize the guardianship, CHINS, and ICPC statutes. "CHINS and guardianship proceedings are distinct, much like CHINS and TPR proceedings are distinct." *I.E.*, 238 N.E.3d at 679. "Indiana Code Article 31-34 governs CHINS proceedings, while guardianship proceedings fall under the probate code." *Id.* Furthermore, this case implicates the ICPC, which is governed by Indiana Code Chapter 31-28-4.

> Matters of statutory interpretation present pure questions of law which we review de novo. The best evidence of legislative intent is the statutory language itself. When interpreting a statute, we give the words used their plain and ordinary meaning and consider the structure of the statute as a whole. We avoid interpretations that depend on selective reading of individual words and lead to irrational and disharmonizing results. If faced with ambiguity, we determine and give effect to the legislative intent as best it can be ascertained. We presume the legislature intended the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals.

*Id.* at 674-75 (internal citations and quotations omitted).

### A. Relevant CHINS Statutes

[26] The CHINS scheme "seeks to provide a balance between a parent's fundamental right to family integrity and the state's interest in protecting at-risk children from parental wrongdoing." *In re Adoption of K.T.*, 174 N.E.3d 621 (Ind. 2021) (David, J., dissenting from the denial of transfer). "In a CHINS proceeding, DCS must complete a permanency plan for a child and seek court approval of the plan." *I.E.*, 238 N.E.3d at 675 (citing Ind. Code § 31-34-21-

5.7(b)(1)-(2)). "A permanency plan is the 'intended permanent or long term arrangements for care and custody of the child' DCS or the trial court considers 'most appropriate and consistent with the best interests of the child[.]'" *Id.* (quoting I.C. § 31-34-21-7.5(c)(1)).

[27] The initial permanency plan for a child is generally reunification, except under certain circumstances not applicable here, and a permanency plan may be later modified. *See* I.C. § 31-34-21-5.5 (requiring reasonable efforts to preserve and reunify families); 31-34-21-5.6 (discussing exceptions to the reasonable efforts requirement); 31-34-21-7 (discussing permanency hearings). A permanency plan may include the appointment of a legal guardian. I.C. § 31-34-21-7.5(c)(1)(D). Indiana Code Section 31-34-21-7.7(a), however, provides:

> If the juvenile court approves a permanency plan under section 7 of this chapter that provides for the appointment of a guardian for a child, the juvenile court may appoint a guardian of the person and administer a guardianship for the child under IC 29-3.

Accordingly, the CHINS court may appoint a guardian for the child if the permanency plan provides for the appointment of a guardian. We have held that, "when the permanency plan for a child adjudicated a CHINS provides for appointment of a guardian under Indiana Code Section 31-34-21-7.7, the filing of a guardianship petition and notice of the petition and hearing are statutory prerequisites for appointment of a permanent guardian." *I.E.*, 238 N.E.3d at 677.

## B. Relevant Guardianship Statutes

[28] Pursuant to Indiana Code Section 29-3-5-3(a), a trial court shall appoint a guardian if the court finds that "(1) the individual for whom the guardian is sought is . . . a minor; and (2) the appointment of a guardian is necessary as a means of providing care and supervision of the physical person or property of the incapacitated person or minor." "Where, as here, a trial court has been asked to consider whether to place a minor in the custody of a person other than the natural parent, . . . 'a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement.'" *In re Guardianship of A.E.R.*, 184 N.E.3d 629, 639 (Ind. Ct. App. 2022) (quoting *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002)).

[29] Indiana Code Section 29-3-5-1 describes the requirements for the contents of a guardianship petition, which includes whether a CHINS action regarding the minor is open. *See* I.C. § 29-3-5-1(a)(13). The guardianship petitioner must also submit "the necessary information, forms, or consents for the department of child services to conduct a criminal history check (as defined in IC 31-9-2-22.5) of the petitioner and any other household members before the court appoints the guardian under this chapter or during the guardianship administration." I.C. § 29-3-5-1.5.

## C. Relevant ICPC Statutes

[30] Finally, the ICPC "facilitates the interstate placement of children and resolves jurisdictional issues." *In re Adoption of J.L.J.*, 4 N.E.3d 1189, 1199 (Ind. Ct.

App. 2014) (citing I.C. § 31-28-4-1), *trans. denied*. "Prior to placing a child in a home or childcare institution located in another state, the person or agency in the 'sending' state must submit written notice to the appropriate authorities in the 'receiving state' to provide information about the child and the proposed placement, as well as the reasons necessitating the placement." *Id.* (citing I.C. § 31-28-4-1 art. III(a)-(c)). "In turn, the receiving state must notify the sending state 'that the proposed placement does not appear to be contrary to the interests of the child.'" *Id.* (citing I.C. § 31-28-4-1 art. III(d)).

The ICPC, however, does not apply to:

> The sending or bringing of a child into a receiving state by the child's parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or guardian and leaving the child with any such relative or nonagency guardian in the receiving state.

I.C. § 31-28-4-1, art. VIII(a). "[T]he plain language of the statute makes clear that the ICPC applies only to the placement of a child in foster care or as a preliminary to a possible adoption." *In re D.B.*, 43 N.E.3d 599, 604 (Ind. Ct. App. 2015), *trans. denied*.

### III. Father's Due Process Arguments

### A. Notice of the Guardianship Action

With these statutes in mind, we first address Father's argument that his due process rights were violated by Aunt's failure to provide Father with proper notice of the guardianship action. According to Father, Aunt failed to provide him with notice of the guardianship action, but he learned of the action, filed a

letter with the guardianship court and CHINS court objecting to the proceeding, and appeared at the guardianship hearing.

[33] Notice of the guardianship petition must be given pursuant to Indiana Code Chapter 29-3-6, *see* Ind. Code § 29-3-5-1(b), and Indiana Code Section 29-3-6-1(a)(3)(B) requires that notice of the petition be given to "[a]ny living parent of the minor, unless parental rights have been terminated by court order." "Notice is not required under [Indiana Code Section 29-3-6-1(a)] if the person to be notified waives notice or appears at the hearing on the petition." I.C. § 29-3-6-1(a). Here, Father appeared at the hearing on the petition. Accordingly, under the guardianship statutes, notice was not required. Given Father's appearance at the guardianship hearing, we conclude that the risk of error was minimal and that Father failed to demonstrate that he was denied "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333. Accordingly, Aunt's failure to provide Father with proper notice did not violate Father's due process rights.

## B.  Failure to Procure Proper Background Checks

[34] Father also argues that his due process rights were violated by the failure to perform proper background checks of Aunt as required by the CHINS and guardianship statutes. DCS argues that Father waived this argument by failing to raise it below. We agree that Father did not raise the lack of compliance with the background checks required by the CHINS and guardianship statutes; Father, however, did raise the lack of compliance with the ICPC background

checks during the hearing on his motion to correct error filed in the guardianship proceeding. Accordingly, we will address the argument.

[35] As we have noted, under the guardianship statutes, Aunt was required to submit "the necessary information, forms, or consents for the department of child services to conduct a criminal history check (as defined in IC 31-9-2-22.5) of the petitioner and any other household members before the court appoints the guardian under this chapter or during the guardianship administration." I.C. § 29-3-5-1.5. Furthermore, Indiana Code Section 31-34-21-7.5(b) required DCS to conduct a criminal history check before requesting the juvenile court's approval of a guardianship permanency plan.

[36] DCS did not conduct this criminal history check before the guardianship was granted. Rather, at a CHINS review hearing on August 30, 2024, DCS submitted an Illinois criminal background check regarding Aunt.[3] While we do not condone the failure to follow the statutory procedures here, the issue before us is whether the failure violated Father's due process rights. We focus on "the third *Mathews* factor, the risk of error created by DCS's actions and the trial court's actions." *C.G.*, 954 N.E.2d at 917-18. Here, the risk of error is minimal. DCS belatedly submitted the criminal background check, and Father has failed

---

[3] Father makes no argument that this criminal background check was insufficient.

to demonstrate that the failure to follow the statutory procedures resulted in a due process violation.[4]

## C. Failure to Follow Proper Statutory Procedures

[37] The majority of Father's argument pertains to the failure to follow the proper procedures outlined in the CHINS, guardianship, and ICPC statutes. According to Father, "by failing to approve a permanency plan of Guardianship in the CHINS court before a Guardianship was granted, the juvenile court acted incorrectly and achieved a Machiavellian, 'ends justifying the means' result, while ignoring the lawful procedures actually required." Appellant's Br. p. 11.

[38] The statutes make clear that, where a CHINS action and guardianship petition are pending, a guardianship may not be granted unless the CHINS court has approved a permanency plan of guardianship. I.C. § 31-34-21-7.7. To comply with these statutes, the following procedures should have been followed here: (1) first, DCS should have initiated the ICPC process and obtained approval to place Son with Aunt through that process; (2) next, DCS should have requested that the permanency plan be modified to include guardianship; and (3) the CHINS court should have then considered Aunt's guardianship petition.

---

[4] Father makes allegations regarding Aunt's alleged drug use, citing his own testimony during the July 31, 2024, permanency hearing. GAL's counsel objected to Father's testimony, and the trial court sustained the objection. Father makes no argument that the trial court abused its discretion by sustaining the objection. Accordingly, we do not consider Father's testimony or offer of proof.

[39] Here, however, the court granted the guardianship petition before the permanency plan of guardianship was approved. By appointing Aunt as guardian before the permanency plan was modified in the CHINS action, Father was denied his reunification opportunities through the CHINS process. Moreover, by appointing Aunt as guardian rather than as foster parent, the parties circumvented the ICPC requirements.

[40] In support of his argument that the procedures used here violated his due process rights, Father relies upon our decision in *I.E.*, 238 N.E.3d 669. In *I.E.*, the juvenile court found the mother's children to be CHINS due to educational neglect, but the mother struggled to comply with the juvenile court's orders. The juvenile court eventually ordered concurrent permanency plans of reunification and guardianship by the grandparents. At a later review hearing, DCS presented evidence of the mother's continued failure to comply with the court orders, requested placement with the grandparents, and requested that the juvenile court schedule a guardianship hearing. The juvenile court scheduled a guardianship hearing for that same afternoon. Although a guardianship petition had not been filed and a written order on the permanency plan had not yet been entered, the juvenile court held the guardianship hearing, which the mother did not attend, and entered an order granting the guardianship. The trial court also entered orders approving a guardianship permanency plan and closing the CHINS cases.

[41] On appeal, the mother argued that the procedure used by the juvenile court to create the guardianship violated her due process rights. We noted that,

"[u]nder the probate code, a trial court cannot appoint a permanent guardian until it has held a hearing, and it cannot hold a hearing until a petition has been filed and notice of the petition and hearing is given to interested parties." *I.E.*, 238 N.E.3d at 676. "[I]t is apparent the filing of a guardianship petition and notice of the petition and hearing are statutory prerequisites for appointment of a permanent guardian of a minor." *Id.* Thus, "when the permanency plan for a child adjudicated a CHINS provides for appointment of a guardian under Indiana Code Section 31-34-21-7.7, the filing of a guardianship petition and notice of the petition and hearing are statutory prerequisites for appointment of a permanent guardian." *Id.* at 677.

[42]    We concluded that the mother's due process rights were violated because: (1) guardianship petitions were not filed; (2) the mother and father received no formal notice of the guardianship hearing; and (3) "because the trial court held the guardianship hearing mere hours after changing the permanency plan and ordering Children immediately removed from her care, Mother had no meaningful opportunity to retain counsel, prepare for the guardianship hearing, and present evidence and argument on her behalf." *Id.* at 678. Accordingly, we reversed the trial court's order appointing the grandparents as permanent guardians of the children.

[43]    Here, we have different circumstances than those in *I.E*. A guardianship petition was filed, and Father appeared at the guardianship hearing and objected. Though the guardianship and permanency plan modification were performed out of the order required by the relevant statutes, we cannot

conclude that Father's due process rights were violated, as the risk of error here is minimal. Reunification was not in Son's best interest when the guardianship was established. A no contact order prevented Father from having contact with Son, and Father had pending battery charges for his alleged abuse of Son. Father was living at Wheeler Mission, and Son had no other relatives in Indiana. DCS points out that Son likely would have been placed in shelter care given his age and behavioral issues. *See* Appellee's Br. p. 47. Moreover, Aunt already had guardianship of Son's sibling, J.T. Even if DCS and the juvenile court followed the proper procedures, the outcome here most certainly would have been the same—guardianship of Son by Aunt.[5] For these reasons, we conclude that Father's due process rights were not violated.

[44] Although we conclude that Father's due process rights were not violated, we cannot condone the trial court's disregard for the guardianship and CHINS statutory procedures here. We also cannot overlook the fact that, when the guardianship was granted, the permanency plan was still reunification. Under normal circumstances, DCS would have been providing reunification services, which would lead parents to believe that reunification with their child was possible. We are perplexed as to how DCS failed to seek modification of the permanency plan before the guardianship was granted. We strongly encourage

---

[5] DCS notes that "DCS may face repercussions pursuant to the ICPC, *see* I.C. 31-28-4-1 art. IV, but that does not equate to any violation of Father's due process rights." Appellee's Br. p. 46.

DCS and trial courts to follow the statutory procedures because, under other circumstances, such failures may result in a due process violation.

## Conclusion

[45] Although DCS and the trial court failed to follow the proper statutory procedures, we conclude that Father's due process rights were not violated. Accordingly, we affirm.

[46] Affirmed.

Altice, C.J., and Brown, J., concur.

ATTORNEY FOR APPELLANT

Michael C. Price
Zionsville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

David E. Corey
Supervising Deputy Attorney General
Indianapolis, Indiana