**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**DIANE SHIELDS**
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE:

**TERESA MORGUSON**
DCS St. Joseph County Local Office
South Bend, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana



FILED

Aug 07 2012, 8:58 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF X.B. and L.B. (MINOR CHILDREN) and | ) ) ) ) |
| J.B. (FATHER), | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 71A03-1201-JT-26 ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE ST. JOSEPH PROBATE COURT
The Honorable Peter J. Nemeth, Judge
The Honorable Barbara J. Johnston, Magistrate
Cause Nos. 71J01-1102-JT-15 and 71J01-1102-JT-16

**August 7, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

J.B. ("Father") appeals the trial court's orders involuntarily terminating his parental rights to his children X.B. and L.B. (collectively, "the Children"). Father contends that the trial court erred in concluding that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children. Finding no error, we affirm.

**Facts and Procedural History**

The trial court's nearly identical termination orders regarding each of the Children contain the following findings of fact and conclusions thereon:

FINDINGS OF FACT:

1. [Father] is the father of two (2) children, [L.B.], born May 8, 2007 and [X.B.], born November 11, 2005.

2. Paternity was established for the children in a hearing on 6-13-08; he failed to appear.

3. Father and [Y.K. ("Mother")], the biological mother of the children who voluntarily terminated her rights, engaged in a relationship where domestic violence and alcohol abuse occurred frequently.

2

4.  The children resided with [Mother] until they were detained on June 20, 2009.[1]

5.  In the Verified Petition Alleging Child In Need of Services filed 6-26-09, Father was not alleged to have committed any wrongdoing that led to the detention of the children.

6.  [Father] was unable to provide a home for the children when the children were originally removed.

7.  Father was repeatedly informed that if he followed through with consistent visits with the children and found a stable place to live, the possibility existed that the children could be placed with him.

8.  Father missed many visits with the children.  The facility where the visits occurred required Father to call if he was going to come for the visit because his "no shows" cause the children to act out angrily.

9.  In a Progress Report dated January 27, 2010, the case manager wrote that Father visited with the children when "able to make it."  She also noted that visits had to be cancelled due to Father's incarceration.

---

[1] According to a report submitted by the court-appointed special advocate ("CASA"),

> On June 20, 2009, South Bend Police responded to a call of animal cruelty.  They arrived at [Mother's home].  There they discovered a dog chained to the front of the home of [Mother].  The dog had no food or water and was barking loudly.  Police notified Animal Control.  While they were notifying the owner that the dog was being removed the police discovered the home to be inappropriate.  Police on the scene wore gas masks in the home.  One (1) officer described the home as the worst conditions he had seen in twenty (20) years on the force.

> The conditions of the home included rotting and molding food, roach and insect infestation, animal and human feces on the floors, unclean clothes and garbage throughout the home.  Officers without gas masks were unable to tolerate the odor of the home.  Officers report that [Mother] stated that she would clean the home if the officers gave her an hour.  [C.G.], age five (5), kept complaining of hunger and was told to be quiet by [Mother] because he "was making mommy look bad."  [Mother] stated that the home was in disarray because she was depressed and pregnant.

State's Ex. 1 at 1.  The Children were placed in foster care until November 2009, when they were returned to Mother's home on a trial basis. In September 2010, the Children were returned to foster care when a Department of Child Services family case manager visited the home and "found it was again in deplorable condition." *Id*. at 2.  Mother voluntarily terminated her parental rights to the Children on November 1, 2011.

10.  Father was charged with a domestic violence incident that occurred in Michigan during the pendency of the instant cause.  He remains on probation.

11.  The St. Joseph County Department of Child Services, "DCS," filed its petition to involuntarily terminate the parental rights of [Father] on February 10, 2011.

12.  Final hearing on the petition occurred on December 2 [sic[2]], 2011.

13.  Testimony elicited at the hearing included that Father had been physically abusive to biological mother while the children were present.

14.  Exhibits admitted into evidence reflect that Father is a Habitual Violator of Traffic Laws, he has driven while under the influence of alcohol, and his driving privileges are suspended indefinitely.

15.  The minor children, [L.B.] and [X.B.], display serious behavioral issues – issues that require setting boundaries and offering structure.

16.  Biological mother's relative was physically abusive to [X.B.].  As a result, the child suffers with nightmares and irrational fears.  According to his therapist, Angelene Bradley, MA, [X.B.] is more out of control following visits with his biological Mother and Father.

17.  Both children have endured neglect to the extent that they do not easily trust adults.

18.  Ms. Bradley opined in a letter marked as State's Exhibit 6 that removal from the foster mother's home would prove dangerous to [X.B.] and [L.B.].

19.   Foster mother, [R.L.], offered testimony concerning the children's behaviors when they initially came to her home and their behaviors today.

20.  [R.L.] explained that at first [X.B.] would punch and scream, throwing temper tantrums.  [L.B.] bit others and cried a great deal.  The children would also talk about "daddy hitting mommy" and how "daddy drinks a lot of beer." Today, the children trust her.

CONCLUSIONS OF LAW

---

[2] Both the chronological case summary and the transcript indicate that the hearing was initially held on November 1, 2011, and was reconvened on December 5, 2011.

4

To terminate a parent's rights, the following elements must be proved by clear and convincing evidence:

I.C. 31-35-2-4:[3]

(A)    One (1) of the following exists:

    (i)    the child has been removed from the parent for at least six (6) months under a dispositional decree; the Order of Disposition was entered on 8-6-09.

(B)    there is a reasonable probability that:

    (ii)    continuation of the parent-child relationship poses a threat to the well being of the child; Here, we see a father who has for a long period of time not acted in the parental role. He has been physically abusive to his children's biological mother in their presence, he has continued to drink alcohol excessively, he has failed to support his children, he has proven unreliable as it pertains to visits with the children, and he has continually failed to find suitable housing. These children have never, until in the home where they now reside, been assured of a safe place. They are developing normally for the first time in their young lives. Their well being cannot be entrusted to a man who does not offer stability. [Father] loves his children. He may have bonded with them at some point. That love and bond, however, cannot erase the previous environment they were exposed to – one filled with fear and instability.

(C)    termination is in the best interests of the children; The court finds that ending this parental relationship provides the best opportunity for these children to thrive. [Father] has never actually begun behaving like a responsible parent; thus, ending his role allows the children to move forward to a new life.

(D)    there is a satisfactory plan for the care and treatment of the children; The plan is adoption by the foster parent who has consistently and carefully parented [L.B.] and [X.B.].

---

[3] The version of the statute quoted by the trial court was amended in 2010. In this opinion, we quote the 2010 version of the statute, which was in effect when DCS filed the petitions to terminate Father's parental rights in February 2011. The statute was amended again in 2012.

**IT IS ORDERED:**

1.    The Petition for Termination is granted.

2.    The parent-child relationship between [the child] and [Father] be, and the same hereby is terminated, and all rights, powers, privileges, immunities, duties and obligations (including the right to consent to adoption) pertaining to that relationship are hereby permanently terminated.

All of which is Ordered this 20th day of December, 2011.

Appellant's App. at 34-35, 38-39.

Father now appeals.  Additional facts will be provided as necessary.

**Discussion and Decision**

Our supreme court has said,

> The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children.  A parent's interest in the care, custody, and control of his or her children is perhaps the oldest of the fundamental liberty interests.  Indeed the parent-child relationship is one of the most valued relationships in our culture.  We recognize of course that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. Thus, parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.

*Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (citations, quotation marks, and alteration omitted).

Indiana Code Section 31-35-2-4(b) provides that a petition to terminate parental rights must meet the following relevant requirements:

(2) The petition must allege:

(A) that one (1) of the following is true:

6

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. "Clear and convincing evidence need not show that the custody by the parent is wholly inadequate for the child's survival. Instead, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development would be threatened by the parent's custody." *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010) (citation omitted). If the trial court finds that the

7

allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

We have long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). In reviewing such proceedings on appeal, we neither reweigh evidence nor assess witness credibility. *Id.* We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn therefrom. *Id.* Our standard of review is two-tiered: we first determine whether the evidence supports the trial court's findings and then determine whether the findings support the judgment. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). In deference to the trial court's unique position to assess the evidence, we set aside its findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *In re J.H.*, 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), *trans. denied.* "A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it." *Id.* A judgment is clearly erroneous only if the legal conclusions drawn by the trial court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*[4] "If the evidence and inferences support the trial court's decision, we must affirm." *In re C.G.*, 954 N.E.2d at 923.

We have said that

> in termination proceedings, the trial court should judge a parent's fitness to care for the children as of the time of the termination proceedings, taking into consideration changed conditions and the parent's habitual pattern of conduct. Additionally, the trial court must examine the patterns of conduct in which the parent has historically engaged in order to determine if future changes are likely to occur.

*In re B.M.*, 913 N.E.2d 1283, 1286 (Ind. Ct. App. 2009) (citation omitted).

Here, Father challenges the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the Children's well-being. More specifically, Father challenges several of the findings underlying this conclusion. First, he claims that "[t]here is nothing in the record to substantiate" the finding that he was physically abusive to Mother in the presence of the Children. Appellant's Br. at 8. On the contrary, the Children's foster parent testified that X.B. "would say, daddy hits mom, mom hits daddy." Tr. at 108. A reasonable inference may be drawn that the Children (or, at the very least, X.B.) witnessed this physical abuse.

Next, Father challenges the trial court's finding regarding his excessive alcohol use. Given his in-court admission to having an alcohol problem, Father wisely does not dispute the trial court's characterization of his alcohol use. Instead, he appears to fault DCS for not

---

[4] DCS argues that because Father has not challenged whether termination was in the Children's best interests, "she [sic] therefore concedes that the court's termination order was not clearly erroneous." Appellee's Br. at 16. This is not the first time that DCS has made this argument. *See*, *e.g.*, *In re E.P.*, No. 47A01-1101-JT-38, 2011 WL 5135373 at *4 n.4 (Ind. Ct. App. Oct. 28, 2011), *trans. denied* (2012); *In re S.W.*, No. 49A02-1007-JT-913, 2011 WL 1102874 at *5 n.2 (Ind. Ct. App. Mar. 25, 2011). As in those prior cases, we emphatically reject the notion that a parent's concession regarding the sufficiency of evidence as to one element of Indiana Code Section 31-35-2-4(b)(2) amounts to a concession as to all elements, given that DCS "must prove, by clear and convincing evidence, *each and every element* set forth in" the statute. *In re G.Y.*, 904 N.E.2d at 1261 (emphasis added). We admonish DCS to refrain from making the same spurious argument in future appeals.

9

identifying it as an issue and offering him an evaluation and treatment. It is well settled that "a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting." *In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000). Father never asserted a need for alcohol counseling. According to DCS family case manager Brenda Catchings, DCS did not become aware of Father's alcohol problem until June 2011, after Father was arrested in Michigan for abusing his girlfriend while intoxicated and after the termination petitions were filed. In sum, Father's argument is meritless.[5]

Regarding child support, Father admitted to being over $32,000 in arrears and having paid only $195 over the past four years. Case manager Catchings testified that Father spent more money on "alcohol and bail" than on child support. Tr. at 62. Father acknowledges that "he has paid very little child support through the courts," but claims that he was using money to fix his house, which he purchased only two months before the termination hearing. Appellant's Br. at 9. In the next sentence, however, he admits to testifying that he had "no excuse for not paying support." *Id.* Father's self-contradictory argument is merely an invitation to reweigh evidence and judge witness credibility in his favor, which we may not do.

As for visitation, Father observes that the CASA's report states that he "visited his children on a regular basis." *Id.* (citing Appellant's App. at 58). That statement was flatly

---

[5] Father claims that he does not drink because he is on probation, but Mother's aunt testified that Father had called her while intoxicated within three weeks of the termination hearing. Tr. at 19.

contradicted by numerous witnesses, including Father himself, who admitted that he missed visits because he was in jail and missed so many visits that he was "required to call in advance so that the children wouldn't show up for a visit that [he] would miss." Tr. at 147. Father also admitted to driving to some visits, even though his license has been suspended indefinitely. Catchings testified that Father was never granted unsupervised visitation and that his visits were reduced from twice to once a week because of his "failure to participate." *Id*. at 52. She further testified that the visitation facility "tried to work around his work schedule and even that eventually was not working." *Id*. This testimony supports the trial court's finding that Father "has proven unreliable" with respect to visitation, and therefore we cannot say that the finding is clearly erroneous.[6]

Father also contends that "he did have suitable housing for the children," Appellant's Br. at 10, but neglects to mention that he had purchased the fire-damaged house for $1000 only two months before the termination hearing, that the water meter had not been installed as of November 2011, and that the gas had not been connected as of December 2011 because the account had to be in someone else's name. Prior to that, Father lived with his brother and also with his girlfriend, who refused to allow the Children to move in with them because she

---

[6] The CASA testified that when Father did visit the Children, he "seemed to be there observing the children whether then [sic] interacting with the children." Tr. at 102. Father himself testified that he

> would just play with them with all the toys that they have there, that are around. But then there's times that I can't do much cause they're looking. They're just standing there and looking at me like if I were to do something. So they just look at me and I don't feel comfortable. And they're talking sometimes like in secret.

*Id*. at 137.

11

was afraid that DCS "would see something bad" and take her own children away from her. Tr. at 150. Based on the foregoing, we cannot say that the trial court's finding that Father "has continually failed to find suitable housing" is clearly erroneous.

Father also challenges the trial court's finding that he "does not offer stability" to the Children, pointing out that he is employed, does not receive government subsidies or food stamps, owns his own home, and has an aunt in Mexico who is willing to assist him with child care. Father's argument overlooks his almost total failure to fulfill his child support obligations, his history of domestic violence and alcohol abuse, his insistence on driving with a suspended license, his illegal immigration status, his transient housing history, his inconsistent visitation, and his inability to recall the Children's birth years or the name of their school and doctor. As for Father's plans to have his aunt care for the Children, we note that "the trial court is to assess the parent's fitness to care for the children as of the time of the termination hearing" and thus Father's "future plans were not evidence on which the trial court could base its opinion." *In re B.D.J.*, 728 N.E.2d at 202 n.1. In sum, Father has failed to establish that the trial court's finding regarding his lack of stability is clearly erroneous.

Finally, Father complains that DCS "did not make reasonable efforts to unite him with his children" and failed to offer him services such as parenting classes and substance abuse treatment. Appellant's Br. at 13. We note that DCS is not required to make reasonable efforts to reunify parents and children in termination proceedings and that "a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009); *see also In re*

12

*E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) ("[T]he provision of family services is not a requisite element of our parental rights termination statute, and thus, even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal.").[7] Moreover, as we have already stated, "a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting." *In re B.D.J.*, 728 N.E.2d at 201. Father failed to request many of the services he mentions in his brief, and his lack of stable housing and consistency in visitation demonstrates a lack of interest in being reunited with the Children.

> We have said that
>
> a trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate.

*In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002) (citation omitted). In light of the trial court's findings regarding the Children's need for support and stability and Father's utter inability to fulfill those needs, we cannot say that the court clearly erred in concluding that continuation of the parent-child relationship poses a threat to the well-being of the Children. Therefore, we affirm the involuntary termination of Father's parental rights.

---

[7] Father also complains that he "did not have an attorney nor an interpreter in all of his contact with DCS and the courts until the Court appointed an attorney on April 25, 2011 and DCS didn't start using an interpreter until after the TPR petition was filed." Appellant's Br. at 12. Father does not assert, let alone establish, that he had difficulty communicating with DCS or the trial court at any time during the proceedings. Nor does he assert that the trial court failed to inform him of his right to an attorney or an interpreter, or that he ever requested one. It is interesting to note that the Children's foster mother testified that she had spoken with Father "[a] few times" and that she had no "problem" speaking with him in English. Tr. at 114.

Affirmed.

RILEY, J., and BAILEY, J., concur.