**Pursuant to Ind.Appellate Rule 65(D), \this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Dec 31 2013, 9:43 am

*Kevin S Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL J. SPENCER**
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

**ROBERT J. HENKE**
Office of Attorney General
Indianapolis, Indiana

**ANNA M. SEBREE**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION     )
OF THE PARENT-CHILD RELATIONSHIP     )
OF: J.A. (Minor Child),              )
                                     )
And                                  )
                                     )
M.R. (Mother),                       )
                                     )
    Appellant/Respondent,            )
                                     )
       vs.                  )     No. 53A01-1307-JT-306
                                     )
THE INDIANA DEPARTMENT OF            )
CHILD SERVICES,                      )
                                     )
    Appellee/Petitioner.             )

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Stephen R. Galvin, Judge
Cause No. 53C07-1210-JT-624

**December 31, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

M.R. ("Mother") appeals the termination of her parental rights to her young son, J.A. She argues that the trial court should have allowed her to reopen evidence and submit additional information about the status of her older child, who was not involved in these proceedings. We find that the trial court did not err in rejecting this request. Mother also challenges the sufficiency of evidence underlying the court's decision to terminate her parental rights. But J.A. has been in foster care essentially from birth, and since that time, Mother has not proven that she is capable of caring for J.A.'s special needs. Mother also failed to comply with all of the trial court's orders. Thus, there was sufficient evidence to support the trial court's decision to terminate the parent-child relationship. We affirm.

## Facts and Procedural History

J.A. was born prematurely in April 2011. Because he weighed just one pound at birth, he was transferred from a Bloomington hospital to Riley Hospital for Children in Indianapolis. Doctors diagnosed J.A. with a number of medical conditions, including a chromosomal disorder, esophageal reflux, chronic lung disease, failure to thrive, and developmental delays. Because J.A. could not swallow, he was fed through a

gastrointestinal tube ("g-tube"). Mother did not visit J.A. during the first two weeks of his life. The local Monroe County Department of Child Services ("MCDCS") took custody of J.A. and filed a petition alleging that he was a child in need of services ("CHINS").

Mother appeared at the initial hearing on the CHINS petition and denied the allegations.[1] After a fact-finding hearing, the trial court adjudicated J.A. a CHINS. The court ordered Mother—who had previously been diagnosed with bipolar disorder and explosive disorder and struggled with substance abuse—to complete mental-health and substance-abuse assessments, follow all resulting recommendations and take all prescribed medications, refrain from using drugs and take random drug screens, and participate in home-based services. Mother was also ordered to learn how to care for J.A.'s medical needs and exercise parenting time regularly.

In 2012, Mother moved from Bloomington to Indianapolis. She moved against the recommendation of a caseworker who told Mother it would make it difficult to comply with the court's orders—particularly exercising parenting time with J.A., who had been placed in a Bloomington foster home, and participating in local services.[2]

Mother completed an initial diagnostic evaluation. As a result of the evaluation, a parenting assessment, substance-abuse treatment, and therapy were recommended for Mother. But Mother routinely missed appointments designed to help her in each of these

---

[1] No other parent was named in the CHINS or termination proceedings; J.A.'s paternity has never been established.

[2] Mother married around this time. At the termination hearing, there was testimony suggesting that Mother's marriage was unstable; however, we need not discuss this issue in our analysis.

3

areas, as well as scheduled parenting time. She also declined home-based services in Indianapolis. Meanwhile, her attendance at J.A.'s doctor appointments was inconsistent.

In October 2012, MCDCS filed a petition to terminate Mother's parental rights. The evidence at the hearing on the termination petition focused primarily on two issues: Mother's failure to complete services and her inability to care for J.A.'s special needs.

Caseworkers testified that Mother failed to complete psychiatric, home-based, substance-abuse, and other therapeutic services. Mother also continued to struggle with substance abuse. Specifically, Mother admitted that in December 2012, she smoked marijuana and drank a half-pint of vodka to help her sleep. *See* Tr. p. 21-22. She also used prescription medication without a prescription. *Id.* at 42. Mother understood that such decisions "put [her] at risk of not getting her child back." *Id.* at 21. Mother also admitted that she missed scheduled parenting time with J.A. *Id.* at 9.

J.A.'s special needs were also discussed at length. J.A.'s foster mother summarized J.A.'s diagnoses:

> He has duplicate chromosome sixteen which is a chromosomal disorder. He has esophageal refl[u]x which is where the food comes up his windpipe. He has chronic lung disease from being ventilated which means that he is at a high risk for his lungs to deteriorate. And then he's been diagnosed with low weight or failure to thrive[], and then [he has] developmental delays related to his prematurity.

*Id.* at 60. According to his foster mother, J.A.'s greatest challenge was eating. At nearly two years old, he was fed through his g-tube: "continually at night for ten hours at 60ccs an hour and then he gets three bonus feedings or feedings where you have to sit right with him the entire time where he gets *six ounces* of formula at nine, one and five [o'clock]." *Id.* at 60-61 (emphasis added). This precise schedule and formula amount was critical—

4

"if you overfeed him he will vomit and it's more likely that he will develop aspiration pneumonia." *Id.* at 63.

In addition to a pediatrician, J.A.'s foster mother explained that J.A. was treated by a number of doctors, including an ophthalmologist, audiologist, and gastroenterologist, as well as developmental, physical, and speech therapists. *Id.* at 63-64. J.A. wore glasses and braces on his legs, and took a number of prescription medications. *Id.* at 68-69.

It was difficult for Mother to understand and manage J.A.'s special needs. Although she was required to attend all of J.A.'s doctor appointments, she missed more than thirty-eight appointments in the time leading up to the terminating hearing. *Id.* at 136. She could not identify all of J.A.'s doctors. *Id.* at 11. She could not name all of J.A.'s medications or say when he was supposed to take them. *Id.* at 6-7. She was not sure how to feed J.A. at night. *Id.* at 29. She could not recall the name of J.A.'s formula, but said she believed he got eight ounces of formula at each feeding. *Id.* at 8. She acknowledged that it was important for J.A. to have his glasses and braces, but admitted that she failed to return those items to his foster mother on more than one occasion. *Id.* at 16. Mother also admitted that her parental rights to her other son had been terminated. *Id.* at 26.

Tamara Saltzman, J.A.'s court-appointed special advocate ("CASA"), told the court that Mother was not capable of caring for J.A. full-time:

> I think that those issues of [Mother] being able to get herself to appointments let alone being able to make all of [J.A.'s] appointments would be way too much for her. I just don't think mentally she can handle all of that. And . . . his future relies upon the therapy that he gets between

5

now and maturity. And I think it's very important that he makes all of these appointments and if he's not there at the appointments it's not [going to] help him. If you skip one it's not [going to] help him. If you go occasionally it's not [going to] help him and I think he needs someone that is . . . organized enough to. . . get him where he needs to be because I think that's crucial for him.

*Id.* at 179. When asked if additional services would enable Mother to care for J.A. full-time, CASA Saltzman said no, "because she hasn't taken advantage of the services provided to her so far and I think that the gauge of future behavior is past behavior." *Id.* She recommended terminating Mother's parental rights.

Melissa Richardson, Mother's case manager, echoed CASA Saltzman. In addition to highlighting Mother's failure to consistently attend doctor appointments and parenting time—Mother missed thirty-eight doctor appointments and sixty-five percent of her scheduled parenting time—Richardson said that Mother understood only "bits" of what doctors told her about J.A.'s care, and struggled to remember it or "put it all together." *Id.* at 138, 140. Richardson said that Mother was simply not capable of caring for J.A. all the time. *Id.* at 161.

Although J.A. was doing very well in his foster home, MCDCS acknowledged that it was not a pre-adoptive home. Caseworkers testified that they had recently begun the process of finding an adoptive home for J.A. Specifically, MCDCS caseworker Laura Farmer testified that she was working with a specialist from their special-needs adoption program called "SNAP." *Id.* at 171.

The court took the matter under advisement. Two weeks later, Mother filed a motion to reopen evidence, seeking to introduce additional information about her older son—specifically, evidence that he also had special needs and had never been adopted

after her parental rights were terminated, as well as evidence that J.A. had been removed from his foster home shortly after the termination hearing.

In September 2013, the trial court entered its order with findings terminating Mother's parental rights. *See* Appellant's App. p. 8-16. The court also denied Mother's motion to reopen evidence. *Id.* at 17.

Mother now appeals.

**Discussion and Decision**

On appeal, Mother argues that the trial court erred by denying her motion to reopen evidence. She also challenges the sufficiency of evidence underlying the trial court's decision to terminate her parental rights.

**I. Motion to Reopen Evidence**

Mother argues that the trial court erred by denying her motion to reopen evidence. "Evidence must be offered during the course of a trial[,] and it is a matter of discretion whether a trial court will permit a party to present additional evidence or testimony once the party has rested, once both parties have rested, or after the close of all of the evidence[.]" *In re D.Q.*, 745 N.E.2d 904, 908 (Ind. Ct. App. 2001). We will disturb the trial court's decision only if there is a clear abuse of discretion. *Id.*

Mother sought to introduce evidence that her older son also had special needs and had never been adopted after her parental rights were terminated. Even if this fact was unknown to Mother at the time of the termination hearing, it is not relevant to the issue of what permanency plan is appropriate for J.A., a different child with entirely different special needs. Mother also sought to introduce evidence that J.A. had been removed

7

from his foster home shortly after the termination hearing. But J.A.'s foster-care placement at the time of the termination hearing was not permanent; it was clear that J.A. would not stay in that non-adoptive home. Thus, we fail to see how this issue had bearing on the court's determination regarding Mother's parental rights. We cannot say that the trial court abused its discretion by denying Mother's motion to reopen evidence.[3]

At the close of her brief, Mother also implies that the trial court's denial of her motion to reopen violated her due-process rights. *See* Appellant's Br. p. 21 ("[T]he refusal to allow the [additional] evidence prejudiced a substantial right of [Mother], namely the right to raise one's children."). Although due process has never been precisely defined, the phrase denotes fundamental fairness. *See In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011) (citation omitted). When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of the due-process clause. *Id.* (citation omitted). A fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful way. *Id.* (citation omitted).

Due process in parental-rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting the use of the challenged procedure. *Id.* (citation omitted.). The private interest affected by the proceeding is substantial—a parent's interest in the care, custody, and control of her

---

[3] Mother also argues unpersuasively that she should have been permitted to reopen evidence because MCDCS later did so. *See* Appellant's Br. p. 21. It is not clear from the record why MCDCS was later permitted to reopen evidence; however, this fact has no bearing on whether Mother met *her* burden in seeking to reopen evidence.

8

child. *Id.* (citation omitted). The State's interest in protecting the welfare of a child is also substantial. *Id.* Because the State and the parent have substantial interests affected by the proceeding, we focus on the risk of error created by DCS's actions and the trial court's actions. *Id.*

Mother attended the termination hearing and testified at length—she had the chance to be heard at a meaningful time and in a meaningful way. And because the additional evidence Mother later wished to present was not relevant to the trial court's determination regarding her parental rights, we think the risk of error in denying Mother's motion to reopen was minimal. Moreover, Mother offers no explanation of how she was prejudiced by the trial court's denial. We find no error here.

## II. Termination of Parental Rights

"The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013) (citations omitted). The parent-child relationship is one of our culture's most valued relationships. *Id.* (citation omitted). "And a parent's interest in the upbringing of their child is 'perhaps the oldest of the fundamental liberty interests recognized by the courts.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). But parental rights are not absolute—"children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *Id.* (citations omitted). Thus, a parent's interests must be subordinated to a child's interests when considering a termination petition. *Id.* (citation omitted). A parent's rights may be terminated if the parent is unable or unwilling to meet their

9

parental responsibilities by failing to provide for the child's immediate and long-term needs. *Id.* (citations omitted).

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Id.* at 1229 (citation omitted). Instead, we consider only the evidence and reasonable inferences that support the judgment. *Id.* (citation omitted). "Where a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous." *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." *Id.* (citation omitted).

A petition to terminate parental rights must allege:

(A) that one (1) of the following is true:

     (i)     The child has been removed from the parent for at least six (6) months under a dispositional decree.

     (ii)     A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

     (iii)     The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

      (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

      (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

      (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "DCS must prove the alleged circumstances by clear and convincing evidence." *K.T.K.*, 989 N.E.2d at 1231 (citation omitted). On appeal, Mother challenges the sufficiency of the evidence supporting the trial court's judgment as to subsections (B), (C), and (D) of the termination statute.

## A. Conditions Remedied

Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive. Thus, MCDCS was required to establish, by clear and convincing evidence, only one of the three requirements of subsection (B). The trial court found that subsections (B)(i) and (B)(ii) were satisfied, and Mother challenges both of those findings on appeal. But because we find it to be dispositive, we address only Mother's arguments regarding subsection (B)(i); that is, whether there was a reasonable probability that the conditions resulting in J.A.'s removal or the reasons for his placement outside Mother's home would be remedied.

11

When determining if there is a reasonable probability that the conditions that resulted in a child's removal or the reasons for placement outside the home will not be remedied, a trial court must judge a parent's fitness to care for their child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re I.A.*, 903 N.E.2d 146, 154 (Ind. Ct. App. 2009) (citations omitted). The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, and failure to provide support. *Id.* The services offered to the parent and the parent's response to those services may also be considered as evidence of whether conditions will be remedied. *Id.*

The trial court concluded that there was a reasonable probability that the conditions resulting in J.A.'s removal from Mother's care or placement outside the home would not be remedied. *See* Appellant's App. 14. The court found that Mother "consistently failed to take advantage of the services offered," and drank alcohol and used drugs while the termination case was pending. *Id.* at 15. The court also found that Mother demonstrated no meaningful understanding of J.A.'s special needs, including his medical treatments and feeding schedule, and she had not attended all of his doctor appointments. The court explained that J.A. was a "medically fragile child" who required "appropriate 24[-]hour care to ensure his health and safety." *Id.* at 15-16. The court concluded that "placing a child with his physical limitations and overwhelming medical needs in [Mother's] care would clearly endanger his life." *Id.* at 16.

12

Mother does not dispute her failure to complete services or her use of alcohol and drugs. Instead, she implies that she will take advantage of services in the future and characterizes her substance abuse as "only [] a few relapses." Appellant's Br. p. 12-13. This is an invitation to reweigh the evidence, which we may not do. Mother also argues that J.A.'s health has improved since birth and—citing two termination cases involving children with special needs—claims that she "has shown that she desires to be involved in [J.A.'s] medical care." *Id.* at 13-14. While J.A.'s health may have improved somewhat with time, the evidence at the termination hearing shows that he still requires careful, precise feeding and monitoring. He also sees a number of doctors and takes many medications. And as for Mother's contention that she has shown a desire to be involved in his medical care, this statement is contradicted by the evidence, including the fact that she missed thirty-eight of his doctor appointments.

While Mother may desire to be involved in J.A.'s medical care, the evidence shows that she is not capable of doing so on a meaningful level. At the termination hearing, Mother could not identify all of J.A.'s doctors, could not name all of J.A.'s medications or say when he was supposed to take them, and incorrectly stated that J.A. was to be fed eight ounces of formula.[4] Mother argues on appeal that she has a system to help her keep track of this information without having to remember it, which makes her inability to recall some information not "particularly vital," but this is an impermissible invitation to reweigh the evidence.

---

[4] J.A.'s foster mother testified that he received six ounces of formula. Tr. p. 60-61. Melissa Richardson, Mother's caseworker, testified that J.A. had never taken eight ounces of formula and had only recently been "bump[ed]" to six ounces. *Id.* at 141.

The evidence supports the conclusion that there was a reasonable probability that the conditions resulting in J.A.'s removal from Mother's care or placement outside the home would not be remedied.

### B. Best Interests

A determination of what is in the best interests of a child should be based on the totality of the circumstances. *See Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied.* A parent's historical inability to provide a suitable environment along with the parent's current inability to do the same supports a finding that termination of parental rights is in the child's best interests. *Id.* Trial courts need not wait until a child is irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating a parent's rights. *See K.T.K.*, 989 N.E.2d at 1235. Permanency is a central consideration in determining the best interests of a child. *Id.* (citation omitted).

Here, the trial court found that termination was in J.A.'s best interests because Mother was incapable of caring for J.A. and J.A. deserved permanency. *See* Appellant's App. p. 16. The court explained that if Mother's rights were not terminated, J.A.—who had been in foster care essentially since birth—would be forced to continue to wait for Mother to be an appropriate parent "although she has never demonstrated an ability to care for either of her children." *Id.* Indeed, those involved with the case testified that Mother was incapable of managing J.A.'s special needs, and they recommended terminating her parental rights.

We conclude that the evidence supports the trial court's determination that termination of Mother's parental rights was in J.A.'s best interests. *See In re A.I.*, 825 N.E.2d 798 (Ind. Ct. App. 2005) (testimony of caseworkers, together with evidence that the conditions resulting in placement outside the home will not be remedied, was sufficient to prove by clear and convincing evidence that termination was in child's best interests), *trans. denied*; *see also In re S.P.H.*, 806 N.E.2d 874, 883 (Ind. Ct. App. 2004) (children's needs are too substantial to force them to wait while determining if their parents will be able to parent them). In the face of this evidence, Mother argues that termination of her rights "will alienate J.A. from those who love him." Appellant's Br. p. 17. This argument is an invitation to reweigh the evidence, which we may not do.

### C. Satisfactory Plan

Mother's final claim is that MCDCS failed to prove it had a satisfactory plan for J.A.'s care and treatment.

In order for the trial court to terminate a parent-child relationship, the court must find that there is a satisfactory plan for the care and treatment of the child. Ind. Code § 31-35-2-4(b)(2)(D). That plan need not be detailed, so long as it offers a general sense of the direction the child will go after the parent-child relationship is terminated. *In re L.B.*, 889 N.E.2d 326, 341 (Ind. Ct. App. 2008).

MCDCS's plan for J.A.'s care and treatment was adoption. Mother argues that this plan was unsatisfactory because MCDCS had not identified a potential adoptive family, and she reiterates that her other special-needs son was never adopted after her parental rights were terminated. But we have previously held that adoption is

15

a satisfactory plan even if a potential adoptive family has not been identified. *E.g., Lang*, 861 N.E.2d at 375. And the unfortunate fact that J.W. has not been adopted does not mean that adoption is not a satisfactory plan for his half-sibling or, as Mother implies, that the same fate awaits J.A. We likewise reject Mother's assertion that "considering the possible difficulty in finding a suitable and willing adoptive family for a child with special needs, adoption does not seem like a satisfactory plan." Appellant's Br. p. 18. While there may be challenges in finding the right adoptive homes for children with special needs, DCS has programs specifically designed to meet these challenges: MCDCS caseworker Laura Farmer testified that she was working with a specialist from their special-needs adoption program called "SNAP" to find a home for J.A. Seeking out such homes is certainly a worthwhile endeavor that enables many children to find loving, permanent families, and we hope that will happen in this case. Mother has not shown that MCDCS's plan of adoption for J.A. was unsatisfactory.

Affirmed.

RILEY, J., and MAY, J., concur.