Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 28 2014, 9:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**RUTH JOHNSON**
Marion County Public Defender Agency
Indianapolis, Indiana

**MARK SMALL**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**DAVID E. COREY**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of D.S. and G.S., minor children, and A.C., Mother, <br><br> A.C., <br><br> Appellant-Respondent, <br><br> vs. <br><br> INDIANA DEPARTMENT OF CHILD SERVICES, <br><br> Appellee-Petitioner. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  No. 49A02-1309-JT-803 |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Rosanne T. Ang, Magistrate
Cause Nos. 49D09-1304-JT-14720 & -14721

**April 28, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

A.C. ("Mother")[1] appeals from the juvenile court's order terminating her parental rights to D.S. and G.S. (collectively "the Children") contending that the juvenile court's order was clearly erroneous.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the juvenile court's decision reveal that Mother and Father were the biological parents of D.S., born on September 22, 2008, and G.S., born on January 26, 2011. Sometime in 2011, the Marion County Department of Child Services ("the MCDCS") received a report that Mother and Father were abusing drugs, engaging in domestic violence, and failing to supervise the Children. As a result of their investigation, the MCDCS discovered that on May 8, 2011, Father was arrested for domestic violence against Mother. Another incident of domestic violence occurred on August 15, 2011, during which Mother struck G.S. in the face. D.S. had been found unsupervised on multiple occasions a block away from the family's home. Mother tested positive for drug use, but denied the use of drugs. On September 14, 2011 the MCDCS initiated proceedings alleging that the Children were children in need of services ("CHINS"), but did not remove the Children from their home at that time.

A pre-trial hearing was held on October 13, 2011, at which time both Mother and Father admitted that the Children were CHINS. The admission was based primarily on

---

[1] The juvenile court also terminated the parental rights of D.S. II ("Father"), the biological father of the children. Father, however, does not participate in this appeal. Consequently, we will recite facts pertinent only to Mother's appeal.

Mother's recent positive test result for cocaine, and that due to her substance abuse, court intervention was necessary. Based upon the admission by Mother and Father, the juvenile court adjudicated the Children as CHINS.

At the November 10, 2011 dispositional hearing, the juvenile court granted wardship of the Children to the MCDCS, but placement of the Children remained in-home with Mother. Mother was ordered to participate in services pursuant to the juvenile court's dispositional and parental participation orders. More specifically, Mother was ordered to keep all appointments with the MCDCS and service providers, maintain suitable housing, refrain from the use of illegal drugs, submit to random drug screens, participate in home-based counseling, and complete substance abuse and domestic violence evaluations and all treatment recommendations.

In January 2012, Mother admitted to MCDCS family case manager Julie Harris ("FCM Harris") that she was using cocaine and pills. FCM Harris was concerned by this admission because the Children remained in Mother's home. At a hearing held on February 2, 2012, the juvenile court ordered the Children removed from their Mother's care, and they have not been returned to their parents' care since that time.

When MCDCS became involved Mother tested positive for cocaine use. Mother admitted on more than one occasion during the CHINS proceedings that she was using drugs, and admitted to FCM Harris on January 26, 2012, that she was currently using cocaine and pills. Because of Mother's positive screens, FCM Harris referred Mother for a substance abuse assessment. Mother completed the assessment and the recommended intensive outpatient program in October 2012. FCM Harris also referred Mother for drug

screens, but Mother was inconsistent in her participation and there were some positive screens. After Mother completed her intensive outpatient treatment, she tested positive for methamphetamines prior to the January 17, 2013 permanency review hearing. Because of the allegations of domestic violence, FCM Harris referred Mother for a domestic violence assessment. As a result, it was recommended that Mother participate in a domestic violence group, which Mother completed in October 2012.

At some point, Mother's visits with the Children transitioned to unsupervised visits. During those unsupervised visits, however, Mother allowed Father to visit the Children even though his visits with them had been suspended. FCM Harris was concerned about Father having visitation with the Children because: his visits had been suspended; there was no way to monitor his sobriety; and he had failed to participate in services for several months. Mother's visits were supervised by the time of the October 11, 2012 review hearing.

Domestic violence between Mother and Father was of additional concern, with some of the incidents of domestic violence occurring in January and February of 2013. At the time of the April 18, 2013 permanency review hearing, Father was incarcerated for domestic violence for the second time since MCDCS became involved.

At the January 2013 permanency hearing, MCDCS did not recommend a change in the permanency plan, which at that time was for reunification. While acknowledging Mother's mistakes, FCM Harris explained that Mother had completed her classes, and that she seemed motivated to move forward to reunification with the Children. Shortly after the hearing, there was a child and family team meeting to ensure that Mother knew what

she had to do in order to be reunified with the Children. At MCDCS's request, the juvenile court set the matter for an additional permanency hearing.

By the time of the second permanency review hearing held on April 18, 2013, Mother did not have stable housing, had been discharged from her home-based counseling due to lack of participation, was not submitting to drug screens, was visiting the Children inconsistently, had ongoing issues of domestic violence with Father, and her last drug screen from January 2013 was positive for methamphetamine. The juvenile court changed the permanency plan to adoption and ordered MCDCS not to re-refer Mother and Father for services.

After the April 2013 permanency hearing, Mother moved to Kentucky where her own father resides. Mother last visited the Children on April 18, 2013. Mother's visits were not suspended. Mother just stopped visiting her children. FCM Harris testified that Mother's inconsistent visitation was detrimental to the Children's well-being because they could not understand why Mother would visit on some occasions, but cancel visitation on other occasions.

On July 23, 2013, a day before a scheduled mediation in the termination proceedings, and during the last conversation Mother had with FCM Harris, Mother told FCM Harris that she was homeless, was still "using," and had some contact with Father. *Tr.* at 36. Mother cursed at FCM Harris before hanging up on her.

At the time of the termination hearing, at which Mother failed to appear, D.S. was four years old and G.S. was two years old. The Children had been out of their Mother's

5

care since February 12, 2012, and were in a pre-adoptive foster care home. The Children were doing very well in the home and had bonded with the foster parents.

FCM Harris testified that Mother never resolved her substance abuse issues or the domestic violence situation. Due to those unresolved issues, in addition to Mother's unstable housing, FCM Harris was concerned about the Children being returned to their Mother's care. FCM Harris believed that termination of parental rights was in the Children's best interests.

MCDCS's plan for the Children was adoption. FCM Harris testified that she believed that this was an appropriate plan for the Children because Mother had not demonstrated an ability to care or provide for the Children's well-being. Further, she testified that adoption would allow the Children to obtain permanency, rather than leaving them in limbo to wonder what was going to happen next. The Children's guardian ad litem also recommended termination of Mother's and Father's parental rights and supported the plan for the Children's adoption. On August 27, 2013, the juvenile court entered its order terminating Mother's parental rights. Mother now appeals.

**DISCUSSION AND DECISION**

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.*

Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.*

Here, in terminating Mother's parental rights to the Children, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

7

> (B)     that one (1) of the following is true:
>
> > (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii)     The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)     that termination is in the best interests of the child; and
>
> (D)     that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis supplied).

Here, Mother makes no argument that she lacked notice of the date of the hearing, nor does she challenge the juvenile court's findings of fact or the conclusions of law. Instead, Mother argues that her absence from the termination proceedings should be excused because of the history of domestic violence between Father and Mother. Specifically, she contends that she suffers from battered women's syndrome and, therefore, was afraid to appear in the same courtroom as Father. Mother concedes that there was no expert evidence in the record to establish that she suffered from battered women's syndrome; nevertheless, she contends that there was ample evidence in the record to establish that she was a victim of domestic violence at the hands of Father. Mother asks

8

that the juvenile court's order terminating her parental rights to the Children be vacated on that extra-record ground.

Notwithstanding Mother's claim, our review of the juvenile court's unchallenged findings of fact and legal conclusions leads us to conclude that Mother was unable to parent, provide care for, and support the Children. Mother had the opportunity to present evidence to support her claim that she suffered from battered woman's syndrome. Mother was provided services to address domestic violence issues present in her relationship with Father. Mother attended many hearings in the underlying CHINS proceedings, but did not attend the periodic review hearing on July 25, 2013. Mother attended these hearings while Father attended only two of the hearings after the November 10, 2011 dispositional hearing. Thus, the record does not support Mother's argument that Father's will prevented her from participating in the termination proceedings.

Furthermore, Mother could have sought relief under Indiana Administrative Rule 14, which provides that a trial court in its discretion may use telephone or audiovisual telecommunication as a means of participating in hearings upon a showing that good cause exists. Indeed, our Supreme Court has held that an incarcerated parent's due process rights are not violated when the parent is not transported to the hearing, but participates instead by telephone. *See In re C.G. v. Marion Cnty. Dep't of Child Servs.*, 954 N.E.2d 910, 920 (Ind. 2011) (due process rights not violated by incarcerated parent's telephonic participation in termination proceedings).

In sum, the findings of fact find support in the record, and the findings, in turn, support the juvenile court's legal conclusions. We will reverse a termination of parental

9

rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly,* 592 N.E.2d 1232, 1235 (Ind. 1992)). Based upon the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to the Children was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

Affirmed.

MAY, J., and BAILEY, J., concur.