# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 20 2017, 9:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

R.B. *(Minor Child)*

and

C.B. *(Mother)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

February 20, 2017

Court of Appeals Case No.
49A05-1609-JT-2036

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Larry Bradley, Magistrate

Trial Court Cause No.
49D09-1603-JT-226

**Robb, Judge.**

# Case Summary and Issue

C.B. ("Mother") appeals the juvenile court's termination of her parental rights to her child R.B. ("Child"), raising a sole restated issue: whether the juvenile court's termination order is supported by clear and convincing evidence. Concluding the termination order is not clearly erroneous, we affirm.

# Facts and Procedural History

Mother is the parent of six children. Child and her twin sister were born prematurely on October 8, 2013.[1] A month later, Child contracted a respiratory virus and was hospitalized for several months. During her hospitalization, Child underwent a tracheotomy to relieve her breathing issues and a gastrostomy to assist her feeding issues. Doctors also diagnosed Child with a congenital heart defect, which will require open-heart surgery in the near future. Child's pediatrician described Child's prognosis as "[a] hundred percent" dependent on Child's caretaker following instructions at home. Transcript, Volume II at 11. Prior to Child's release from the hospital, the Indiana Department of Child Services ("DCS") filed a petition in early March 2014 alleging Child was a child in need of services ("CHINS"). DCS' goal in filing the petition was to prepare and assist Mother in caring for Child's special needs, including the hiring of a healthcare nurse to help care for and feed Child.

---

[1] Child's father's parental rights were terminated on July 26, 2016, and he is not a party to this appeal.

Child's doctors recommended Child follow a strict feeding schedule, regularly visit Child's pediatrician to monitor Child's weight, and visit other specialty physicians for Child's remaining health issues. On March 27, 2014, the hospital released Child to Mother and the juvenile court dismissed the CHINS action on April 14, 2014.

[3] In July 2014, Child developed low-weight issues and missed at least eight doctor appointments, including six weight appointments. Medical personnel contacted Mother on more than one occasion to bring Child in to be examined, but Mother failed to do so. On July 25, 2014, Child's pediatrician contacted law enforcement and Child was placed in inpatient care at a local hospital. Around the same time, Child's pediatrician discovered Mother had fired Child's home healthcare nurse. On July 31, 2014, DCS filed a second petition alleging Child was a CHINS. Although Child was in the hospital, the juvenile court ordered Child be removed from Mother's care. Thereafter, Child was released from the hospital and placed in a foster home.

[4] On September 15, 2014, Child was returned to Mother's care. On September 29, 2014, the juvenile court adjudicated Child a CHINS and ordered Mother to participate in services, including family centered therapy, and meet all of Child's medical needs. Within the next few weeks, Mother was evicted from her home, Mother did not have the necessary medical supplies, and DCS discovered Child's oxygen tank was empty. Child was again hospitalized and later returned to her foster family, where she has remained.

On March 17, 2016, DCS filed its termination petition. Following an evidentiary hearing in early August 2016, the juvenile court issued its order terminating Mother's parental rights, relevant portions of which we note:

> 24. In the spring of 2015, [Mother] was working with therapy but parenting time remained supervised until [Mother] could care for [Child's] special needs.
> 25. By July 2015, [Mother] had been unsuccessfully discharged from two therapy referrals.
> 26. On July 20, 2015, parenting time was closed due to "no shows". [Mother] explained to the family case manager at the time that she had a lot going on and was in between housing and employment.
> 27. Stability has been an issue for [Mother] during the CHINS matter. She has been in several locations, some without hot water, electricity, or gas at times.
> 28. [Mother] has been at her current address, without being on a lease, for two months.
> 29. The week before trial in this matter, the family case manager requested to see [Mother's] current living arrangement. [Mother] refused.
> 30. [Mother] has minimally, if ever, attended [Child's] many medical appointments since removal.
> * * *
> 33. Two other CHINS cases were filed on [Mother's] other children during [Child's] ongoing case.
> 34. In February 2015, there was a lack of supervision issue resulting in a CHINS filing.
> 35. [Child's] twin . . . is a failure to thrive baby. Due to weight issues and missed medical appointments, she was found to be [a CHINS] on January 8, 2016, after [Mother] admitted to needing transportation for doctor appointments and to meet [Sister's] medical needs.
> 36. [Child's] medical needs remain significant and require 24/7 supervision. She needs to remain in an environment where she is

made a priority.

37. [Child's] day consists of several feedings and respiratory treatments. She has five different medical machines to use, as well as portable machines.

38. [Child] sees five specialists along with her primary pediatrician which results in multiple ongoing medical appointments that are important to make.

39. [Child] will require ongoing lifelong care and observance. Future care will require additional training on the part of her caretakers.

40. [Child] is expected to undergo open heart surgery within the next two years.

* * *

46. There is a reasonable probability that the conditions that resulted in [Child's] removal and continued placement outside the home will not be remedied by her mother. [Mother] failed to complete services, was sometimes sporadic in parenting time, and did not make an effort to follow up with understanding [Child's] medical care. She has not shown the interest in [Child] to now come forward and become able to do all the things needed to care for [Child's] multitude of medical issues and provide supervision, especially with another fragile child in the home. [Mother] also has a history of unstable housing, and inappropriate housing to [Child].

47. Continuation of the parent-child relationship poses a threat to [Child's] well-being in that it would pose as a barrier to obtaining permanency for her through an adoption . . . . To place [Child] in an environment where it is doubtful [Mother] would make the effort to appropriately care and supervise [Child] would place her life in danger.

[6]     Appellant's Appendix, Volume II at 69-70. This appeal ensued.

# Discussion and Decision

# I. Standard of Review

When we review a termination of parental rights, we neither weigh the evidence nor judge witness credibility and we consider only the evidence and reasonable inferences most favorable to the judgment. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). Where, as here, the juvenile court entered findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. *Id*. "We will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1123 (Ind. Ct. App. 2013) (citation omitted).[2]

---

[2] In somewhat convoluted fashion, Mother appears to challenge our well-settled standard of review. Specifically, she takes issue with the substantial deference Indiana appellate courts give to juvenile courts in parental termination proceedings and claims such deference gives parents little chance of successfully challenging a termination order on an evidentiary basis. Mother cites to *In re V.A.*, 51 N.E.3d 1140 (Ind. 2016), where our supreme court reversed a juvenile court's termination order, and in so doing, cited a 2011 law review article examining Indiana appellate courts' reluctance to reverse termination orders. *See generally* Karen A. Wyle, *Fundamental Versus Deferential: Appellate Review of Terminations of Parental Rights*, 86 Ind. L.J. Supp. 29 (2011). We do not read *In re V.A.* as ridding appellate courts of a deferential standard of review in termination cases; rather, *In re V.A.* restates our analysis focuses on the findings of fact and conclusions of law determined by the juvenile court, 51 N.E.3d at 1144, and emphasizes our heightened standard of review requires appellate courts to be mindful that "a standard of proof loses much of its value if a reviewing court does not apply sufficient scrutiny to enforce it[,]" *id.* at 1144-45 (quoting *Wyle*, *supra*, at 37). Mother's challenge to this extent fails and we therefore address the merits of Mother's claims by examining whether the evidence supports the juvenile court's findings and whether the findings support the judgment.

# II. Termination Order

Mother contends the juvenile court's termination order is clearly erroneous. Specifically, she claims DCS failed to present clear and convincing evidence to establish there is a reasonable probability the conditions resulting in Child's removal will not be remedied or a reasonable probability the continuation of the parent-child relationship poses a threat to Child's well-being. We disagree.

"[T]he involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed . . . ." *In re K.W.*, 12 N.E.3d 241, 249 (Ind. 2014) (alteration in original) (citation omitted). Indiana Code section 31-35-2-4(b)(2) sets out what must be proven in order to terminate parental rights, which we provide in relevant part:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child[; and]
>
> * * *
>
> (C) that termination is in the best interests of the child. . . .

The State must prove each element by clear and convincing evidence. Ind. Code § 31-34-12-2; *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009). If a juvenile court determines the allegations of the petition are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[10] In determining whether conditions leading to a child's removal will not be remedied, the juvenile court must judge a parent's fitness to care for her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). "[I]t is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. The juvenile court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *In re A.B.*, 924 N.E.2d at 670 (citation omitted). However, the juvenile court cannot focus solely on historical conduct to the exclusion of evidence as to the parent's current circumstances or evidence of changed conditions. *In re C.M.*, 960 N.E.2d 169, 175 (Ind. Ct. App. 2011). The juvenile court may also consider the services the State offered to the parent and the parent's response to such services. *In re A.B.*, 924 N.E.2d at 670.

[11] In maintaining DCS did not meet its burden, Mother claims the juvenile court's termination order is based on conditions no longer present at the time the juvenile court entered the order. Specifically, Mother contends the sole reason

Child was removed from her care was due to missed medical appointments and the evidence establishes Mother has remedied those issues causing her to previously miss medical appointments. Contrary to Mother's view, the findings establish Child was initially and continually removed from Mother's care due to Mother's medical neglect and housing instability. After Child's birth and subsequent medical issues, Mother was responsible for providing Child with constant care and supervision. In the spring of 2014, DCS provided services to assist Mother, but Mother ultimately discharged Child's home healthcare nurse, failed to take Child to necessary doctor appointments, and as Mother acknowledges, "was tardy with some feedings." Appellant's Brief at 6. Thus, it is clear DCS' initial concern revolved around more issues than Mother's inability to take Child to the necessary doctor appointments.

[12] In summer 2014, the juvenile court ordered Child's removal and Mother again stepped up her participation in services. DCS concluded Mother responded appropriately to services and Child was returned to her care. However, in fall 2014, the juvenile court again removed Child from Mother's care due to Mother's housing instability and medical neglect. By spring 2015, Mother was participating in therapy, but her parenting time with Child remained supervised until DCS felt confident Mother could care for Child's special medical needs. Then, just a few months later, Mother was unsuccessfully discharged from two therapy referrals and her supervised parenting time was closed due to her lack of attendance. Specifically, Mother was scheduled to visit with Child on five separate occasions, and without providing an explanation in advance, Mother

did not attend three of those visits. *See Lang v. Starke Cty. Office of Family and Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) ("Also, the failure to exercise the right to visit one's children demonstrates a lack of commitment to complete the actions necessary to preserve [the] parent-child relationship.") (alteration in original) (citation and internal quotation marks omitted), *trans. denied*. In addition, Mother has missed the vast majority of the Child's medical appointments.[3] Therefore, it is clear Mother has not taken the appropriate steps to remedy DCS' initial and continuous concern about Mother neglecting Child's medical issues.

[13] As to Mother's housing instability, we note Mother has lived at several addresses since Child's removal, and as the juvenile court found, some of these living situations were not suitable for Child. At the time of the termination hearing, Mother had lived at her current address for only two months, she was not named on the lease, and merely a week prior to the termination hearing, Mother *denied* DCS access to the home to determine whether the home was suitable for Child. Although we acknowledge evidence in the record indicating Mother's current home is suitable to raise her *other* children, we must

---

[3] To the extent Mother challenges the juvenile court's finding Mother did not attend Child's medical appointments throughout the pendency of this case, we note there is evidence in the record indicating Mother was made aware of most appointments and failed to attend. Thus, Mother's argument she did not have knowledge of the doctor's appointments in advance merely invites us to reweigh evidence and reassess witness credibility, which we will not do. *In re C.G.*, 954 N.E.2d at 923.

emphasize Mother denied DCS access to the home to determine whether it is suitable to care for *Child* and her medical needs.

[14] In sum, Child's medical issues are severe and demand around-the-clock care in a suitable environment. Child was removed from Mother's care due to Mother's inability to provide Child with the requisite standard of care. DCS presented evidence Mother did not consistently participate in services and she was unsuccessfully discharged from some services, Mother was no longer allowed supervised visits with Child due to Mother's lack of attendance, Mother currently lives in a home where she is not named on the lease and previously denied DCS access to the home for inspection, and Mother has not actively participated in Child's treatment by attending doctor appointments. We therefore conclude DCS presented sufficient evidence to show a reasonable probability the conditions leading to Child's removal or her continued placement outside of Mother's care will not be remedied.[4]

# Conclusion

---

[4] As noted above, Mother also contends the juvenile court erred in finding continuation of the parent-child relationship poses a threat to Child's well-being. However, Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires only one element in that subsection be proven to support termination of parental rights. *See In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Because we conclude the evidence is sufficient to show a reasonable probability the conditions resulting in Child's removal will not be remedied, we need not also determine whether the juvenile court erred in concluding continuation of the parent-child relationship posed a threat to Child's well-being.

DCS established by clear and convincing evidence the elements necessary to support the termination of Mother's parental rights. The judgment of the juvenile court terminating Mother's parental rights is affirmed.

Affirmed.

Kirsch, J., and Barnes, J., concur.